## HARRISON *vs.* POOL.

1. P., who was never married to, but lived with an illegitimate daughter of R. B. H., had charge in South Carolina of certain slaves as his overseer, which he afterwards for fifteen years held possession of in this State, claiming and controlling them as his own. R. B. H. within this time lived in the immediate neighborhood of P., and repeatedly spoke of the slaves as P.'s property, but when about to die executed a will, bequeathing them to P. in trust for the benefit of certain other slaves whom he attempted to manumit. The will, at the drawing up of which P. was present and gave the names of most of the slaves so bequeathed, required that he should, before he assumed the execution of the trust, enter into bond for its faithful performance. After the death of R. B. H. and the probate of the will, K. H., one of the distributees of the estate, was appointed administrator with the will annexed, and demanded the slaves from P. P. surrendered them to him, and he kept them for two years, when they were distributed under an order of the Orphans' Court, and some of them carried to other States, P. having actual notice of the Orphans' Court proceedings and of the consequent division of the slaves, and making at the time no objection to either. *Held*—I. That in a suit by P. against K. H. for the recovery of the slaves, it was not competent for him to prove that before he surrendered the slaves, J. H., one of the distributees, told him that if any of them fell to his share he would make him "a compliment" of them;—II. That the record of the proceedings in the Orphans' Court touching the distribution of the slaves was admissible evidence for K. H.;—III. That a receipt from P. to the administrator for "all demands in full against the estate," if he claimed under the will, was relevant, but, if he claimed by independent title adversely to the estate, irrelevant testimony;—IV. That it was competent for K. H. to prove the application of P. to the Register in Chancery to enter into the bond required by the will, as conducing to show that he considered the slaves as passing by it.

2. Where the possession of property is acquired and held for a time in subordination to the title of another, to render it adverse, there must be a disclaimer of the original title and an actual hostile possession of which the true owner had notice, or which is so ostensible and notorious as to furnish a reasonable or *prima facie* presumption of notice.

3. An adverse possession of personal property for more than six years gives a complete title, without reference to the intention or understanding of either or both of the parties at the time of its delivery.

4. If P. having the title to slaves, recognises the right of R. B. H. to dispose of them by will, and upon a demand by the personal representative of R. B. H. surrenders them to him, and with actual notice of all

the proceedings, stands by and suffers them, without objection on his part, to be divided, under an order of the Orphans' Court, among the distributees of the estate, and carried by them into other States, he is estopped from setting up against such personal representative any claim for or on account of said slaves.

Error to the County Court of Dallas. Tried before the Hon. A. J. Saffold.

DETINUE for a number of slaves by defendant against the plaintiff in error, who was the administrator with the will annexed of Richard B. Harrison, deceased, and also a distributee of his estate. The slaves in controversy belonged to the decedent in South Carolina, and were in charge of the defendant in error as his overseer. The latter lived with an illegitimate daughter of the decedent as his wife, but they were never married. The decedent and defendant in error removed from South Carolina to this State, and the slaves after the removal remained in the possession of the defendant for some fifteen years, and were worked by him on lands which were said to belong to the decedent and were situated near his residence. During the time defendant had the slaves in possession, he publicly and notoriously claimed and treated them as his own, and the decedent repeatedly spoke of them as the defendant's property. Just before the decedent's death, he executed a will, by which he bequeathed said slaves to the defendant, in trust for the benefit of other of his slaves whom he attempted in his will to manumit, and required that the defendant should, before he assumed the execution of the trust, enter into bond for its faithful performance. The defendant was present when this will was made, and gave to decedent the names of the slaves so bequeathed. After the decedent's death, the plaintiff in error as his administrator demanded the slaves of the defendant, who surrendered them to him. The plaintiff kept them in possession about two years, and they were then distributed under an order of the Orphans' Court, the distributees executing to the administrator refunding bonds, and some of them, who resided out of this State, took the slaves allotted to them along with them. The defendant proved that one of the distributees of the estate informed him, before he surrendered the slaves to the administrator, that if

any of said slaves sued for should fall to his (the distribu-
tee's) share, he would make him "a compliment" of them.—
The plaintiff objected to this testimony, but the court refused
to exclude it.   The plaintiff proved actual notice to the de-
fendant of the proceedings in the Orphans' Court touching the
distribution of the slaves, and of the division made under it,
and that he took no steps in opposition to it, and in connection
therewith offered in evidence a transcript of said proceedings
in the Orphans' Court, to which the defendant objected, and
the court refused to allow it to go the jury.   The plaintiff also
offered to read in evidence, after first proving the signature,
two receipts given by the defendant to the plaintiff in error
whilst said slaves were in the possession of the latter, by the
first of which he acknowledged to have received from him as
administrator "all the demands in full" which he had against
the estate, and by the other "all the notes and accounts" which
the estate had against him, and which were given up "accord-
ing to the request" of the deceased, and proved that at the time
the will was drawn the deceased said to the defendant that
there were various demands between them, and he believed
defendant would fall in his debt on a settlement, but that he
wished no claim made upon him, and that no claim should be
made by either party against the other, to which the defendant
then agreed.   The defendant objected to the reading of the
receipts, and the court sustained the objection.   The plaintiff
further offered to read in evidence an entry on the minutes of
the Register in Chancery at Cahawba, in the following words,
having first proposed to prove it by the Register : "Before the
Register, this 28th May, A. D. 1844 : in the matter of the trus-
teeship under the will of Richard B. Harrison.  This day came
before the Register Ephraim Pool, appointed trustee under the
will of Richard B. Harrison, deceased, and applied to give
bond and qualify as such trustee, which application is refused
by the Register."   It was shown that this application was not
made by the defendant in person, but by his attorney with his
knowledge and consent.   The defendant objected to the read-
ing of this entry, and the proof proposed to be connected with
it, and the court refused to let it go to the jury.

The court charged the jury, that if Pool had just reason to
believe and did believe that Harrison intended the negroes for

his benefit, and under this belief held them, openly using and claiming them as his own, this would be such an adverse possession as would ripen into a title in six years; but that if they believed that Pool acquired the possession of the slaves from said Harrison as a loan, and that such was understood to be the character of his possession both by himself and Harrison, no length of time would ripen his possession into a title. The defendant below asked the court to charge the jury, that whether it was a gift or loan depended on the intention of Richard B. Harrison, and that if Pool was in doubt as to what his intention was, it was his duty to inquire and ascertain such intention, which charge the court refused to give. He also asked the court to charge that the plaintiff is not entitled to recover in any event except for the slaves in the defendant's possession, which charge the court refused, and instructed the jury that it was immaterial whether the defendant had the slaves in possession or not at the time the suit was instituted, provided he had them in possession at any time before.

To the several rulings of the court, to the charges given, and to the refusal to give the charges requested, the defendant excepted, and now assigns them as error.

HUNTER, for plaintiff in error.

G. W. GAYLE, for defendant.

CHILTON, J.—This was an action of detinue, brought by Pool against the plaintiff in error to recover certain negro slaves described in the pleadings. There was a verdict for the plaintiff below. Upon the trial a bill of exceptions was sealed by the presiding judge, which sets out the proof *in extenso*, and upon which the errors are assigned in this court.— There was proof conducing to show that the slaves in controversy had belonged to Richard B. Harrison, who had at one time resided in South Carolina, where the defendant in error had been an overseer for him and in charge of said slaves in that capacity: That afterwards, and for some fifteen years prior to the institution of this suit, the defendant in error claimed said slaves as his own, and repeated declarations of Harrison were proven, by which in speaking of said slaves, he mentioned them as "Pool's negroes;" that after their removal to

this State, Pool remained in possession of the slaves, but re-
sided on land said to be owned by said Harrison, and situated
a few miles distant from his residence; and that Pool occasion-
ally lived with the reputed illegitimate daughter of Harrison as
his wife, but was never married to her.   It was further shown
in the proof, that Harrison a short time before his death made
a will bequeathing these slaves to Pool, in trust for the benefit
of certain other slaves, whom he attempted to manumit by his
will; that Pool was present at the time of his making this will,
and gave him the names of the slaves so bequeathed, and
made no objection; and that the provisions of the will required
Pool, before he entered upon the execution of the trust, to en-
ter into bond for its due performance.  This will was admitted
to probate.   After the death of Richard B. Harrison, the plain-
tiff in error administered upon his estate and demanded the
slaves of Pool, who surrendered them to him, and after keep-
ing them some two years, a division of said Richard B. Har-
rison's estate was made, and these slaves·were apportioned
with the other property, by the order of the Orphans' Court,
among the several distributees of the estate, who gave the
usual refunding bonds to the administrator, and some of them,
residing without the limits of this State, took their portions of
said slaves with them.

In the court below, Pool, the plaintiff, was allowed to prove
by John Harrison, one of the distributees, that he, the witness,
had informed said plaintiff, previous to his surrendering the
slaves to the administrator, that if any of said slaves should fall
to his share, he (to use his own words) would make " a com-
pliment" of them to said plaintiff.   It is insisted by the defen-
dant in error, that this proof was properly admitted as show-
ing the inducement of Pool to give up the slaves, and explain-
ing the *quo animo* he parted with them.   The argument does
not sustain the position.   The administrator, who is the plain-
tiff in error, and to whom the property was delivered, was
neither party nor privy to the conversation.   It is not even
shown that he had knowledge of it before the distribution of
the property by the order of the Orphans' Court.   Upon what
principle then can he be injuriously affected by the promises
or declarations of a third party, with whom he had no connec-
tion in any way whatever?   We cannot conceive how such

proof can be admitted legally against him. The declarations were not made at the time of the delivery, so as to constitute a part of the *res gestæ*, and although they would doubtless be received as evidence iu a suit by Pool against John Harrison, the witness, they are as to the administrator *res inter alios*, and clearly inadmissible. Redman v. Roberts, 1 Iredell's Rep. 479; Hanberger v. Root, 6 Watts & Serg. 431; Perry v. Graves, 13 Ala. Rep. 246.

The record of the Orphans' Court, which the court excluded, and which showed a distribution of the property sued for among the distributees of the estate, was clearly admissible as evidence. It was offered in connection with proof, showing that the plaintiff below was fully apprised of the proceedings which it recited, to show that the slaves then in defendant's possession had been allotted to him upon a distribution of the property of the estate, and thus to make out his title. Pool having upon the administrator's demand of the property delivered it up to him as assets of the estate for distribution, notwithstanding he may have been assured by some of the distributees that they would relinquish to him whatever share of said property might fall to them, could not hold the administrator responsible for the slaves which had by order of the court been distributed and thus placed out of his possession and beyond his control. The proof should have gone to the jury, so that they might determine whether the distribution which it evidenced was not in accordance with and a consummation of the intention of Pool in making the surrender, and to show that the administrator had been legally divested of a portion of the slaves for which he was sought to be charged. The record showed the action of the court and of the administrator predicated upon the conduct of Pool in surrendering the property, and that the slaves then in the defendant's possession had been allotted him as one of the distributees of the estate. Suppose that the whole of the slaves had been allotted to the defendant, and the other distributees had received an equal number of the slaves of the estate about which there is no controversy, should not the defendant be allowed to say in answer to Pool's demand for the slaves of him—"You placed them in the hands of the administrator of the estate as assets for distribution—that distribution has been

made, they have fallen to me as my portion of the estate, and I have never either directly or indirectly acknowledged your claim, nor consented to yield to you my proportion of said slaves; and since as a consequence of your act in surrendering the slaves and in consummation of the purpose for which the surrender was made the slaves are allotted to me, you shall not be allowed to take advantage of your admission to my prejudice." We think it very clear that the record of the distribution of the property, connected with Pool's surrender of it to the administrator for that purpose, was legitimate and should not have been rejected.

If Pool had claimed the slaves under the will of Richard B. Harrison, then the receipt from him in full of all demands given to the administrator would certainly have been relevant testimony as conducing to show that he had no claim or right of action against the estate. The word "demand" would certainly embrace the claim which he might assert against the estate for the slaves, as according to Lord Coke, it is the most comprehensive term known to the law except the word claim, and a release of all demands releases "all mixed actions, a warranty, which is a covenant real, and all other covenants whether real or personal, conditions before they are broken or performed, and after annuities, recognizances, obligations, contracts," &c. Coke Lit. 291, b. If however he claimed the slaves, independent of the estate and by title adverse, then it is equally clear that the receipts were wholly erelevant and inadmissible.

The County Court also erred in rejecting the record of Pool's application to the Register of the Chancery Court to give bond, according to the will of Richard B. Harrison, as preparatory to his entering upon the trust which he supposed the will created. This proof was conclusive to show that he considered the property as passing by the will, and in connection with the proof of his presence when the will was made and his having furnished the testator assistance in its execution, was proper for the consideration of the jury. If the application was made by counsel as a mode of obtaining possession of the slaves, and not for the purpose of acquiescing in the title which is asserted by the will, and Pool was merely induced to resort to the remedy upon the advice, that

he would be entitled to the absolute property in the slaves, if he could obtain them in that way, this would go far to destroy the effect of such evidence, but would not render it incompetent. The jury should determine upon the weight which it should have as an admission by Pool of property in the testator.

As this case will have to go back, it is proper that we should briefly state the law arising upon the charges which were asked and refused in the court below, and also upon those given, as a guide for the future conduct of the cause. Adverse possession is a question of fact, to be determined by the jury, according to the rules which the law prescribes. Where the possession is acquired and held for a time in subordination to the title of the true owner, then, to constitute an adverse possession, there must be a disclaimer of the original title, and an actual hostile possession of which the true owner had notice, or which is so ostensible and notorious as to furnish a reasonable, or *prima facie* presumption of notice. If Pool held the property adversely as above stated, it is wholly unimportant whether at the time it was delivered, Richard B. Harrison considered the property as loaned to him or not, for if Pool esteemed the property as having been given to him, and under that belief, asserted claim to it, as his own and held it notoriously adverse, his possession after the expiration of six years, from the commencement of such adverse possession, would ripen into a complete title, irrespective of the intention of Richard B. Harrison. So also, if the property had been originally loaned, and so understood by both parties, but Pool afterwards disclaimed the title of the lender, and held adversely under such circumstances as to charge the lender with notice of his disclaimer and adverse possession, the property would vest in him after the expiration of six years from the commencement of the adverse possession. It is laid down generally, and we think correctly, that an adverse possession for a length of time which makes out a title under the statute of limitations, may be set up against any title whatever. Bradstreet v. Huntingdon, 5 Peters, 438; Jackson v. Deffendorf, 3 Johns. Rep. 267; Angel on Limitation, 396, and note 1, (2d edit.) See also Kitty v. Fitzhugh, 4 Rand. 600; Ratrie v. Saunders, 2 Har. & John. 327; Callis v. Tolson, 6 Gill. & John. 90; Smart v. Baugh, 3 J. J. Marshall, 363.

In this case the property was delivered to the administrator as assets of the estate for the purpose of having the estate settled, and the question was presented in the court below, whether the administrator was liable in this action of detinue for the property which had, under the order of distribution, gone into the hands of the other distributees of the estate. We need not discuss the question, whether if a bailee dispose of property in accordance with the terms of the bailment, and in ignorance of the rights of a third party, he can be made liable in an action of detinue for the property thus disposed of. Lee v. Matthews, 10 Ala. Rep. 682; Pool v. Adkinson, 1 Dana's Rep. 110. But confining our opinion to the law arising upon the facts of the case before us, we feel quite sure that if the property was delivered up by Pool upon the administrator's demand, as assets of the estate of Richard B. Harrison, and Pool did not at that time, nor at any time previous to the distribution of the property among the several distributees by order of the Orphans' Court, assert or make known his claim to the administrator, then he is estopped from setting up such claim. The rights of third parties, who have acted upon the admission which his relinquishment implies, have become vested, the settlement of the estate so far as a distribution of the property is concerned, has been based on such admission; the other distributees have received their portion of the property, and to hold the administrator liable in detinue, or any other action for the slaves thus voluntarily surrendered and distributed by a court of competent jurisdiction would equally oppose the principles of law and the plain dictates of justice. It would be to make the administrator responsible for the plaintiff's own folly in delivering up property as belonging to the estate which really belonged to him; and a further consequence of the plaintiff's recovery would be to overturn the proceedings of the court distributing the slaves, and to involve the estate in another settlement after the slaves shall have been restored, or to turn the administrator round to his action upon the refunding bonds which he had taken of the distributees for his indemnity. See as to estoppel, Robison v. Coker 11 Ala. Rep. 472; Gamble v. Gamble's adm'r, ib. 976, and cases cited from 3 C. & P. 136. See also the numerous authorities collated in 1 Sup. U. S. Digest, 566–7;

2 U. S. Digest, 205; 2 Phil. Ev., note 192, p. 199, *et seq.*— If, as the proof indicates, Pool was induced to surrender the slaves upon an assurance of some of the distributees that he should have as a donation whatever share of the slaves might fall to them, we will not say he could not recover from the party making such promise the share allotted to him; but it is not pretended, as we have before stated, that the plaintiff in error made any such promise, or knew that any one else had done so. As to him, then, the doctrine of estoppel *en pais* applied. It follows that the charge asked by the defendant below, under the facts of this case, "that the plaintiff could not recover in any event except for the slaves in the defendant's possession at the commencement of the suit," was more favorable to the plaintiff against whom it was asked than the law would warrant, and should have been given.

It is unnecessary to examine the other points raised, as it is not probable they will arise on another trial.

Judgment reversed, and cause remanded.

# REPORTS

OF

# CASES ARGUED AND DETERMINED

AT THE

# JUNE TERM, 1849.