## PURYEAR, Ex'r, *vs.* PURYEAR.

1. Slaves purchased by a wife, in the life-time of her husband, with her separate estate or the proceeds thereof, will be regarded in a Court of Equity as standing in the same predicament, in respect to the title, as the money that was paid for them; and if she is in the possession of slaves thus purchased, or in which her husband has conceded to her the exclusive title, she may, after his death, successfully defend an action at law brought by his personal representative for their recovery. The fact that the purchase was made from the husband himself cannot affect the principle.

2. If a wife purchases property from a firm, of which her husband is a member, pays for it with money furnished by him, and with his acquiescence takes a bill of sale in the name of a third person for her use, will not the transfer of the title operate as a postnuptial settlement and be effectual against all persons except creditors and purchasers ?—QUERE.

3. The use of the wife's money by the husband, in the purchase or the redemption of his own encumbered property, will not *per se* invest the wife with such a title as will enable her, after her husband's death, to successfully defend an action at law brought by his personal representative for its recovery, and a charge to the jury which assumes the reverse of this principle is clearly erroneous.

Error to the Circuit Court of Monroe. Tried before the Hon. John Bragg.

DETINUE by the plaintiff as executor of Alexander B. Puryear, deceased, to recover of the defendant in error, who is the widow of his testator, slaves Sarah, Anna and Harriet, and her four children. On the trial a bill of exceptions was sealed at the instance of the plaintiff, from which it appears that in 1833, Alexander B. Puryear, deceased, and his wife, the defendant, removed from Virginia and settled in Monroe county, bringing with them the slaves Anna and Harriet, and that they remained in their possession until the death of the testator in 1842: that before the testator and his wife left Virginia in 1833, these slaves had been sold under a deed of trust by one Fisher and bought by him, with the promise that he would relinquish all title to them to the said testator on his discharge of the amount due by him, which had been done, but with whose money, or in what way the debt was discharged, does not appear to have been shewn with any cer-

tainty. There was evidence that the testator had frequently spoken of these slaves since his removal to Alabama as the property of his wife, and also evidence to show that by her thrift and industry, and with her husband's permission, she had accumulated a considerable sum of money, which she frequently loaned in greater or less amounts to her husband, taking his notes for such loans and receiving payment thereof from him. There was also proof that she owned a boy called Dan, by bequest from her brother, that the testator had hired him from her one or two years in Virginia, and paid her the hire, and that when they came to Alabama, the testator was insolvent, and Dan was left in possession of Fisher. It is further shown by the bill of exceptions, that Sarah was owned by the testator and plaintiff in error, who were partners in negro trading under the firm name of A. B. & R. C. Puryear, and by the direction of the testator was sold by one Goode, to the defendant, who paid for her and took a bill of sale in the name of Martha Puryear, her mother. Goode had before this sale been the general agent of A. B. & R. C. Puryear in selling slaves, but at the time of the sale was not acting in that capacity.

Upon this state of facts, the court charged the jury: 1st. That if Sarah belonged to the firm of A. B. & R. C. Puryear, and the bill of sale was made by Goode and acknowledged by A. B. Puryear, one of the partners, the plaintiff was not entitled to recover said slave. 2d. That if the slaves Anna and Harriet were redeemed from Fisher with the money of the defendant, that then the plaintiff could not recover them, although they had not been settled on her, to her sole and separate use.

To these charges, the plaintiff excepted, and each of them is now assigned as error.

T. & J. WILLIAMS, for plaintiff:

1. Where property is purchased in the name of the the wife, such property vests immediately in the husband,— Barlow v. Bishop, 1 East's Rep. 432; 2 Story's Eq. 754, § 1386; Roper on Husb. & Wife, 169, 170; and that the purchase is made with money, the proceeds of a separate estate, makes no difference, if the purchase is made by the wife and not by the trustee.—12 Pick. 173; 7 Meeson & Welsby, 183.

2. Where property is purchased and paid for, but titles taken in the name of a stranger, a trust results in favor of the purchaser, or person paying the purchase money—2 Story's Eq. 439 to 445; and in such case where the trust is for the benefit of the wife, the marital rights of the husband will attach, so soon as the husband reduces the property into possession.—1 Atk. 603; 1 P. Wms. 308; 1 Peters, 508. This is settled in all the cases where trusts are created for the benefit of husband and wife jointly, unless words are used expressly defeating these rights. 2 Story's Eq. 608, § 1831; Lamb, trustee, v. Wray, et al. 8 Porter, 72.

A. B. COOPER, for the defendant:

All the principles involved in this case were settled in the case of Puryear v. Puryear, 12 Ala. 13. That case was maturely considered, and the authorities cited and refered to in that case fully sustain it—many other authorities may be adduced.

The plaintiff relies entirely upon the cases in 7 Meeson & Welsby, and 12 Pickering. The case in M. & W., was a case where creditors were seeking to subject the property. This fact alone, whatever else may be in the case, is sufficient. This court in the case in 12 Ala., drew the distinction between the administrator and the creditors. The case in 12 Pickering has no bearing on this case—there was no pretext there that the wife had a separate estate. Opposed to these authorities see—10 Wend. 335; 17 Johns. 552-3-4 and 577; 2 Story §§ 1375-1386; 11 Ala. 386; Clancy, 272; 4 Mason, 443, 454; 1 Vesey 46-48; 3 P. Wms. 337, 338; 2 Vern. 535.

COLLIER, C. J.—In Hoot, et al. v. Sorrell, et al. 11 Ala. Rep. 386, it was held that the profits derived by the wife from her separate estate are her property, and may be disposed of or invested by her as she pleases; and property which she acquires by purchase with her income is not subject to the payment of the husband's debts, especially if she has not allowed it to go into his hands, or be subject to his control. It has been supposed that a wife may sell her separate estate to her husband, may use it in making a purchase from him, and that such a purchase will be protected against his creditors.

Clancey on H. & W., 350; 2 Bro. Rep. 51; 2 Vesey, Jr. Rep. 698; 10 Vesey's Rep. 139. Although the husband is not bound to account to the wife for her separate estate which she has permitted to go into his possession without objecting, yet if it was received by him without her knowledge, he has been held chargeable for it—Clancey on H. & W., 351 to 354; 2 Vesey's Jr. Rep. 488; 2 P. Wms. 82. So if the wife advance her separate property as a loan to her husband for the payment of his debts, she is entitled to stand in the place of the creditors. And where the separate money of the wife is applied by the husband in the purchase of an estate, she will *pro tanto* be an incumbrancer upon the estate.—Clancey on H. & W., 612; 2 Atk. Rep. 383; 5 Mad. Rep. 414; 10 Vesey's Rep. 511.

Where a second husband borrowed money from his wife, which came to her in right of her first husband, and gave her his note for it: *Held*, that the note was a valid security, and after the death of the maker, might be set up in equity against his estate. Huber v. Huber's adm'rs., 10 Ohio Rep. 371.— Even gifts between husband and wife have been supported in equity.—1 Atk. Rep. 270. So where the husband voluntarily allowed the wife for her separate use to make a profit of various articles beyond what were used in the family, of which she saved £100, which the husband borrowed; the wife's right to the money was upheld *against his estate.*—3 P. Wms Rep. 337. It has been often decided in chancery that a post nuptial conveyance by the husband to the separate use of the wife, will be sustained, where the consideration is property received from her.—2 Roper on H. & W., 227; Reeve's Dom. Rel. 166; 1 Atk. Rep. 269; 10 Ves. Rep. 146; 2 Johns. Ch. Rep. 537; 7 Johns. Ch. Rep. 57.

In Piquet v. Swan, et al. 4 Mason's Rep. 443, it was insisted that although a post nuptial settlement by a husband upon his wife, might be valid, yet the moment the proceeds or income arising from the property secured were paid by the trustees in the hands of the wife, they ceased to be trust funds, and were immediately liable to the payment of the husband's debts in the same manner as if they had been her property not secured by trusts. Mr. Justice Story said, "this proposition is utterly untenable in a court of equity. It involves in

·effect, a total defeat of the original trusts. These trusts were to secure the income and proceeds to the sole and separate use of Mrs. Swan, with an unlimited power to dispose of them as a *feme sole.* Nothing is more clear than that the separate property of a *feme covert,* secured or given to her separate use, will be upheld for her use by a court of equity into whosever hands the same may come, whether of a stranger, or even the husband ; if it comes clothed with trusts, and with notice of it, the party so possessing it, becomes a trustee for the *feme covert.* It is in no sense the property of the husband, and can never become his, except by a voluntary appropriation of it to his use, by the wife herself. She may invest it as she pleases; and appropriate it to furniture, or pictures, or plate, or jewelry, or bank stock, or other securities, or personal ornaments or paraphernalia, still it is her own, and cannot be touched while she retains her power and dominion over it." *Again:* "Indeed, the moment courts of equity decided that *femes covert* could hold separate property to their own use as *femes sole,* it was a necessary consequence that the protection of it should be as universal as the right."

It is said that the separate provisions for married women are—1st, where property is settled in some form to their separate use : 2d, where an allowance is made to them by their husbands, before or during marriage, for their maintenance, &c. The former being for her separate use, is her separate estate, of which she may dispose as she thinks proper ; but the latter being intended for personal enjoyment, she cannot deprive herself of it. If she save money out of her separate estate, the savings are always hers against all claimants. And if she purchases lands and houses with what she has saved, the court will follow the purchase and secure it against the husband for her benefit. Clancey on Husband and Wife, 3, 271 to 276.

A *feme covert* acting with respect to her separate estate in personal property, and the rents and profits of her real estate during life, it is said is competent, according to equity jurisprudence, to act in all respects as if she were a *feme sole.*—1 Bro. Ch. Rep. 19 ; 2 Ves. Sr. Rep. 190. With respect to that property a court of equity will consider her so far distinct from her husband as to suffer her to sue or be sued by him,

or by any other person.—3 Atk. Rep. 478; 3 Mad. Rep. 474; 1 Ves. Jr. Rep. 278; 9 Ves. Rep. 486; 2 Ves. Sr. Rep. 452; 3 Johns. Ch. Rep. 77. It must be observed that what we have said in respect to the settlement or bequest of property to the separate use of married women, indicates the principles which are recognised and administered in equity; the common law will not allow her to possess personal property independently of her husband.—Puryear & Wallace v. Beard, 14 Ala. Rep. 121, and citations there made to the point.

In Puryear v. Puryear, 12 Ala. 13, it was decided that where a husband permits the wife to lend for her own use, money which she was allowed to receive for the hire of a slave, and after the husband's death the money thus lent is repaid to her by the borrower, the administrator of the husband cannot recover it from her. But the husband could not thus have disposed of the hire to the prejudice of creditors. It was admitted by the court that the husband might have claimed the money, and that it was liable for the payment of his debts; but having died without asserting any claim, the administrator could not maintain the action. *Further:* "We can perceive no reason whatever, why the wife, in cases like this, should not be protected in the enjoyment of the property by a court of law. If she were compelled to sue the personal representative, as for a debt due from her husband, possibly she would have to resort to a court of equity, but being in possession of the fund, and having the right to retain it, she has both the legal and equitable title to it, and may doubtless defend that right in a court of law. The acknowledged principle, that where the evidence of a debt is in the name of a married woman, the husband may join his wife with him in the suit, and that if he does, it will survive to her, if he dies pending the suit, is entirely analogous to this case, and shows that after the decease of the husband, without reducing the money to his possession, the legal title to it is vested in the wife." In Slanning v. Style, 3 P. Wms., Rep. 337, the wife retained the excess over the sum allowed for the expenses of the family by her thrift and management, with the permission of her husband, and she was held to be entitled to it against the personal representative of the latter. The Lord Chancellor observed " that it was the strongest proof of the husband's con-

sent, that the wife should have a separate property in the money arising by these savings, in that he had applied to her to lend him this sum, in which case he did not lay claim to it as his own, but submitted to borrow it as her money."

There can be no question, if the view we have taken of the law is correct, that if the slaves Sarah, Anna and Harriet, were purchased by the defendant in the life time of her husband with her separate estate or the proceeds of it, that a court of equity would regard them as standing in the same predicament in respect to the title, as the money that was paid for them. We have seen that in such case, if the wife is in the possession of personal property in which she has a separate estate, or in which the husband has conceded to her the exclusive title, she may after the husband's death successfully defend an action at law for its recovery by his personal representatives. The fact that Sarah was the joint property of the testator and his copartner is altogether immaterial in the present case. This action is not brought by the surviving partner for the purpose of vindicating any right of his own, but he sues as executor, asserting the title of the testator. Now although Goode may have been dismissed from the employment of A. B. & R. C. Puryear, previous to the sale of Sarah, yet it was entirely competent for A. B. Puryear to invest him with an authority to sell her generally, or to some person designated. It appears that the testator authorised Goode to sell her to the defendant; and that the latter purchased and paid for her—taking a bill of sale to her mother, professedly from A. B. & R. C. Puryear, by Goode. No question seems to have been made whether the defendant used the money of the testator or her separate funds. But conceding that the testator furnished the money and acquiesced in the sale and investment of the defendant's mother with the legal title, in trust for his wife, did he not thus part with the right to the slave, and can his executor now assert a title? Will not such a transfer operate as a post nuptial settlement, and even if voluntary be effectual against all persons but creditors and purchasers? If Sarah was paid for with the separate estate of the defendant, there would be no question of the superiority of her title, for a court of equity would uphold the trust in her favor, and her husband being dead, her possession would unite both

the legal and equitable title, and authorise her to maintain her right in any forum. True, a conveyance to a third person upon an implied trust that the property shall be held for the benefit of a married woman may not exempt the property from liability to the husband's debts; but when the husband himself sells property, receiving money from the wife, which he admits she is authorised thus to invest, and makes a bill of sale to a third person, he cannot after having consummated the transaction by a delivery, assert by suit its invalidity, and his executor or administrator does not stand in a more favorable position.

The charge that if the slaves Anna and Harriet were redeemed from Fisher with the money of the defendant, then the plaintiff could not recover, although they had not been settled to her separate use, assumes that where the husband uses the wife's money in the purchase of the property, the property at the election of the wife becomes a substitute for the money, and she will have the same title to it that she had to the money. Perhaps the charge assumes more than this as the alternative, viz : that the employment of the wife's separate estate, even in paying part of the purchase money, entitles her to hold the property at least until she is reimbursed. It cannot be known from the record, whether the testator redeemed Anna and Harriet, or whether they were redeemed by the defendant, or whether any and how much of her money was used in effecting that object. There was, however, evidence adduced which should have been refered to the jury in the solution of these questions. If the husband or his agent employed the separate funds of the wife in redeeming these slaves from Fisher, this would only give her a right in equity to subject them to her reimbursement; but could not *per se* invest her with the *legal title*, which is essential to the maintenance of the defence relied on. What may be the fact upon this point, perhaps may be ascertained with more exactness than we are at present informed; be this as it may, what we have said sufficiently indicates what principles are to control in the adjustment of this controversy. It results as a consequence that the judgment must be reversed, and the cause remanded.

DARGAN, J., not sitting.