## KNIGHT *vs.* BELL, Adm'r.

1. When a slave is loaned to a married woman by her father, for the benefit of herself and children, and goes into the possession of her husband, the interest of the wife, which is merely that of a bailee, vests in the husband by virtue of his marital rights, unless they are excluded by the terms of the loan.

2. Three years' possession by the husband, under a loan to the wife, without a deed or other written instrument recorded, subjects the property, by force of the statute of frauds, to sale under execution against the husband, and the purchaser would acquire the absolute property, against the lender and those claiming under him.

3. But where the purchaser, in such case, at the time of sale, agrees with the husband, that the latter shall have the slave again upon the repayment of the purchase money, and the money is accordingly repaid. and the slave return-

ed to the possession of the husband, he again becomes, as between the lender and himself, but a mere bailee as before, and cannot defend against the lender under the title of the purchaser at execution sale.

4. A deed or will creating a life estate in a slave, in favor of a *feme covert*, to her separate use, without the interposition of a trustee, vests the whole beneficial interest in her, and the law makes her husband a trustee for its protection; upon his death, the legal title also becomes vested in her.

5. When there is a conflict in the evidence, the court should refuse to charge, at the request of either party, (unless he will wholly abandon that part of his evidence which conflicts with that of his adversary,) that, if the jury believe all the evidence, they must find for the party asking the charge.

6. To enable a bailee to assert an adverse possession against his bailor, he must do some open, unequivocal act evincing such intention, and this must be brought to the knowledge of the bailor.

ERROR to the Circuit Court of Sumter.

Tried before the Hon. B. W. HUNTINGTON.

DETINUE by Bell as administrator of Peter Knight, deceased, against Phereby Knight, for certain slaves.

On the trial below, Bell, the plaintiff, proved that he was administrator of Peter Knight, deceased, and that his intestate had been in possession of the slave Cynthia in this State ever since the year 1838, and that he died in possession of her and the other slaves in controversy, who were her children; that Knight, while in possession of Cynthia, called her his, and said she was liable for his debts; that in June, 1840, said slave was sold under execution against said Knight, and purchased by one Daniel, with an understanding between him and Knight, that whenever said Knight should repay the purchase money, which was about $400, he was to have the slave back; that said Knight, about two years after the sale, got one Lyon to repay the purchase money, and had repaid said Lyon. Plaintiff also proved the value and defendant's possession at the commencement of the suit.

The defendant proved that she was the wife of said Knight, and daughter of one Frederick Bell, late of Edgecombe county, North Carolina; that in the year 1833, in said county, said Bell brought said slave Cynthia to her and her husband, and delivered her into their possession, as they were about leaving for Alabama, saying at the time that he loaned the said slave to said Phereby and her children; that he would not give the slave to her, for if he did, she would be sold for

said Peter's debts, and that he loaned the slave to her for the benefit of herself and her children. The defendant also proved that she and her husband, shortly after thus receiving said slave, removed to Alabama with her, and had possession of her in this State up to the time when said Peter died in 1850; and that she was in possession when this suit was commenced. She also proved, that, after the sale of the slave under execution, said Knight had said that said slave had been loaned to his wife; and that he had made the money to get her back, and he wanted to secure her to his wife and children; that said Frederick Bell died in North Carolina, in 1846, and that by his last will and testament, which was duly admitted to probate in February, 1846, he bequeathed the slave Cynthia and her increase to the defendant.

The provision of the will is in these words: "I give and bequeath to my daughter Phereby Knight, wife of Peter Knight, during her natural life, for her sole, separate and exclusive use, free from the debts or engagements of her said husband, slave Cynthia and her increase since she went into the possession of said Phereby, and all the other property put in her possession; and, after her death, I give the said slave and her increase, as well as the other property, unto my grand daughter Elizabeth Knight, daughter of the said Peter and Phereby, her executors and administrators."

This was all the evidence in the cause.

The court charged the jury: "That if they believed Peter Knight, some two years after the purchase by Daniel at the sale under execution, repaid, or caused to be repaid to said Daniel the purchase money, and believed the other evidence of the plaintiff, the plaintiff is entitled to recover, defendant's remedy, if she had any, being in chancery."

To this charge defendant excepted, and requested the court to charge, "that if the jury believed all the evidence, they must find for the defendant." This request the court refused, and the defendant excepted.

The charge given, and the refusal to charge as requested, are assigned for error.

T. REAVIS, for plaintiff in error:

Upon the state of case presented by the bill of excep-

tions, it is contended in behalf of the plaintiff in error: first, that the legal title to the slaves sued for, was not in the plaintiff below; secondly, that if it was, he held it as a mere dry trustee for the plaintiff in error, who is entitled to the possession, and can defend the possession against him, at law; thirdly, that if he had any interest at all in the slaves, he has not the entire interest; and fourthly, that the charge of the court excluded evidence from the consideration of the jury which might properly have induced them to find for the defendant.

I. The following propositions show conclusively that the legal title is not in the plaintiff:

1. The loan to Knight's wife and children was, to the extent of his wife's interest, a loan to him. Maull v. Hays, 12 Ala. Rep. 500; McCoy v. Odom, 20 Ala. Rep. 502.

2. The legal effect of the loan was a contract of bailment between him as borrower and Bell as lender. McKisick v. McKisick, Meigs' Rep. 427; Hardeson v. Hays, 4 Yerg. Rep. 507; McDonald v. McDonald, 8 Yerg. Rep. 145; Hunter v. Sevier, 7 Yerg. Rep. 131; Story on Bailments, §§ 219, 220.

3. By this contract Knight was bound, so long as he had the power, to redeliver the slave to Bell, whenever called for. He could not acquire or set up a title adverse to him. Story on Bailments, § 266.

4. The statute of frauds was never intended to affect the contract of loan as between the parties themselves; it merely divests their rights under the contract, as between them and creditors and purchasers of the borrower. Clay's Dig. 254, § 2; Marler v. Marler, 6 Ala. 367; Roden v. Murphy, 10 Ala. 810.

5. Nothing short of six years' adverse possession could give Knight a title, as between himself and Bell. To have made his possession adverse, there must have been a disclaimer of Bell's title, and a possession hostile to it, of which Bell had notice. Harrison v. Pool, 16 Ala. 167; Green v. Harris, 3 Ired. Rep. 210; Darden v. Allen, 1 Dev. Rep. 468; Weeks v. Weeks, 5 Ired. Eq. Rep. 111; Spalding v. Grigg, 4 Geo. Rep. 75; Smith v. Jones, 3 Eng. Rep. 109; Hunter v. Sevier, 7 Yerg. Rep. 131; McKisick v. McKisick, Meigs' Rep. 427; Hardeson v. Hays, 4 Yerg. Rep. 507; McDonald v. McDonald, 8 Yerg. Rep. 145.

14

He could not, therefore, have acquired a title by selling the slave, after having had possession three years, and then repurchasing her, unless Bell had had notice of these acts, and did not assert his title within six years afterwards. His having permitted the slave to be sold for his debt, and his subsequent repurchase, amount to nothing more than a sale by himself and a repurchase. If, therefore, he did not acquire the legal title by six years' adverse possession, if the statute of frauds did not affect the contract between him and Bell, and if that contract bound him to return the slave to Bell when called for, he did not acquire the legal title, as against Bell, by repurchasing the slave. So long as he remained bound by the contract with Bell, it was impossible for him to acquire a title which he could set up against him. As between them, then, the legal title remained in Bell, and passed by bequest in his will either to the plaintiff in error or to his executor.

II. If Knight acquired the legal title by the sale and repurchase, he held it in trust either for Bell, to whom he was bound by the contract to return the slave when called for, or for his wife and children, who were entitled to the possession or use of her. If for Bell, all his title passed to the plaintiff in error by the bequest; if for the plaintiff in error, either under the loan or under the bequest, she being entitled by either to the possession and use of the slave, on the death of her husband, the legal title united by operation of law with her possession. Even if by the death of her husband, the legal title vested in the plaintiff below, as his administrator and her trustee, she being entitled to the possession and use of the property, may defend her possession against him at law. This is expressly decided in Puryear v. Puryear, 12 Ala. Rep. 13; Puryear v. Puryear, 16 Ala. 491–2; Cook v. Kennerly, 12 Ala. Rep. 42; Gunn v. Barrow, 17 Ala. 747.

The cases of Gamble v. Gamble, 11 Ala. 966; Machen v. Machen, 15 Ala. Rep. 377; and Williams v. Maull, 20 Ala. Rep. 721, do not militate against these views, nor against the cases referred to in support of them. In all these cases the husband had the legal title, and it was held, that he could not vest it in his wife, by any act or declaration during the coverture, so as to enable her to set up the title in a court of law.

In this case, Knight never had the legal title, or, if he did have it, he held it as a naked trustee for those entitled to and having the possession.

III. If Knight acquired any interest in the slave by his purchase after the sale under execution, he did not acquire the entire interest; consequently, the plaintiff below has not the entire interest, without which, he cannot recover in the action of detinue. Bell v. Hogan, 1 Stew. 536; Miller v. Eatman, 11 Ala. Rep. 609.

The loan having been made to Knight's wife and children, he, in right of his wife, only had a joint possession with his children; only his interest in the slave was divested by the sale; that of his children was not affected by such sale. McCoy v. Odom, 20 Ala. Rep. 507. Consequently, if he acquired any title by the sale and repurchase, it was only such as made him either a joint owner with Bell, or with his own children. His administrator, therefore, could not sue alone.

IV. The bill of exceptions shows, that there was evidence introduced by the plaintiff below of an understanding between Knight and Daniel, who became the purchaser of the slave at the sale under execution, that Knight could have her back, upon the repayment of the purchase money; it also shows, that Knight did repay the purchase money in pursuance of this agreement; and it shows, that there was evidence introduced by the plaintiff in error, that Knight remained in possession of the slave from the time he came to Alabama until his death; that after the sale, Knight said the slave had been loaned to his wife; that he had made the money to get her back; and that he wanted to secure her to his wife and children. These are facts which the jury ought to have been allowed to take into consideration in connection with each other, so as to determine whether the sale under execution was any thing more than a contrivance to secure an advance of money by Daniel to pay off the debt; whether Knight intended to effect a change of title as between him and Bell, and whether after repayment of the purchase money he did not still consider himself as holding possession of the slave under the loan, and for the benefit of his wife and children. Yet the charge of the court excluded all the defendant's testimony from the consideration of the jury, and confined their

investigation to the plaintiff's evidence alone. This is clearly erroneous. Nabors v. Camp, 14 Ala. Rep. 460; Carlisle v. Hill, 16 Ala. Rep. 398; Jones v. Welch, 15 Ala. Rep. 306; Mims v. Sturdevant, 16 Ala. Rep. 154.

BLISS & BALDWIN, *contra*, cited Williams, Ex'r, v. Maull, 20 Ala. 721.

PHELAN, J.—The evidence introduced on the part of Mrs. Knight in the trial below, conduced to prove, that the slave Cynthia had been loaned to her about the year 1833, when she and her husband were about leaving North Carolina to come to Alabama, for the benefit of her and her children, or that the loan was to her and her children; and that her husband had always held them in that way.

This loan conferred upon Peter Knight, her husband, whatever interest she acquired by it, because it does not appear that the loan, whether to herself alone or collectively with her children, was in any manner to her separate use. McCoy v. Odom, 20 Ala. 502. But this interest in the wife was never anything more than a bailment, and consequently never amounted to anything more when the law, by virtue of the marital right, vested it in her husband. He acquired her interest, whatever it was, and that only. Story on Bailments, 219, 220.

When this slave was sold under execution against Peter Knight, there can be no doubt but that Daniel, the purchaser at the sheriff's sale, acquired the absolute property as against Bell, the lender, and all claiming under him, by force of our statute of frauds. The three years' possession by the debtor, without any deed or other instrument duly recorded, setting forth a more limited estate in him, subjected the absolute property to sale as against Bell, and this the purchaser acquired. Clay's Dig. 254, § 2; Myers v. Peek, 2 Ala. 648.

But when Knight subsequently repurchased this slave from Daniel, what consequences did the law attach to that act? Did he acquire the title of Daniel, or did he only place himself in a position where, as between Bell and himself, he would be considered still as the loanee or bailee of Bell? It cannot be doubted but that the latter was the true position in

which he stood. Had he been sued by Bell for the slave, he could not have defended against him under title from Daniel, nor would he have been allowed, as a bailee, to set up against his bailor title in another. So far as Bell was concerned, he had violated his contract of bailment in suffering the slave of Bell to be taken and sold for his debt; and when he acquired her back by a purchase, he only restored things to that posture which good faith required him to do towards his bailor. This, then, did not enlarge his title or estate in the least. He remained after the repurchase from Daniel, where he was before the execution sale, the loanee of Bell by virtue of his marital rights, holding just such a possession and interest as was given to his wife by her father, when they were about leaving North Carolina, and no more. Story on Bailments, § 266, and authorities.

The repurchase took place about 1842, and in 1846 Bell made his will, by which he gave his daughter, Mrs. Knight, a life estate in the slave Cynthia and her children, "to her sole and separate use," with remainder over to his grand daughter. Upon the supposition that the slave was delivered as a loan or bailment, the lender had a perfect right to resume the actual possession at any time. This would include the right to convey to another, or to enlarge the interest of the bailee by the creation of a greater estate in him or her, either by deed or will. The creation of this life estate, then, to her separate use, in Mrs. Knight, by will, was a good and valid act, on the supposition that the original delivery was as a loan, and conferred upon her all the estate and interest which such an act can confer upon a *feme covert.* Gunn v. Barrow, 17 Ala. 743.

This brings us to the consideration of the extent and nature of that estate. A life estate in a slave, created by deed or will, in favor of a married woman to her separate use, and to her directly, without the interposition of a trustee, gives rise to a question, not as to the extent of her interest, but as to the nature of her title, about which there is found some difficulty in coming to precise and definite conclusions, which need not now be encountered. All the authorities agree, that such a deed or will vests the whole beneficial interest in the wife, and that the law makes her husband a trustee for its

protection. And further,—waiving still the discussion of the question as to where the legal title is, or what becomes of it during the life of the husband—no doubt is entertained, that on his death a full legal title exists in the wife. Puryear v. Puryear, 16 Ala. 491 ; Same v. Same, 12 Ala. 13.

As long, then, as her husband lived, Mrs. Knight had no title under this will of her father, upon which she could either prosecute or defend at law under her own name. That right and that duty were cast by the law upon her husband as her trustee. But when her husband died, and she became again a *feme sole*, the legal title and the beneficial interest became operative together in her at once, and she was fully compe-tent both to prosecute and defend at law, in respect to the slave in question.

It will be readily seen, that the charge which was given by the court was erroneous, according to the views here laid down, because it absolutely precluded the jury from consid-ering the defence set up by the plaintiff in error; the judge being of opinion that chancery was the only forum in which that defence could be interposed, when, as we conceive, the case as presented by her proof conduced to show a good de-fence at law, she having, according to that proof, both the possession and the legal title to the slaves in controversy.

The charge which was asked by defendant, was correctly refused. In one feature of the case, the proof made by the plaintiff below, and that made by the defendant, is some-what conflicting. I allude to that portion of the proof which relates to the manner in which Knight in his lifetime claimed to hold the slave Cynthia. If the administrator of Knight set up for his intestate a title acquired by an adverse posses-sion against Bell for six years before the making of his will, the proof on this point became material, and is evidently conflicting. Such a charge as that which was asked, and which amounts in fact to a demurrer to evidence, may and should always be refused where the proof is at all conflicting, unless the party asking it will wholly abandon the evidence which conflicts with that of the opposite side.

It may not be amiss to add, that the proof set out in the record would not establish an adverse possession in Peter Knight against Bell. A bailee, to throw off the obligations

which rest upon him as such, and become an adverse holder towards his bailor, must do .some open and unequivocal act evincing such an intention, and this, to affect the bailor, must be brought to his knowledge. The proof in this case does not show such a state of facts. Harrison v. Pool, 16 Ala. Rep. 167.

For the error in the charge of the court, the judgment below is reversed, and the cause remanded.