# Plummer *v.* Hardison, *et al.*

## *Trover.*

(Decided November 12, 1912. 60 South. 502.)

1. *Limitation of Action; Bailor; Trover.*—Limitation does not begin to run against the bailor, and in favor of the bailee until the bailee does some act in repudiation of the bailment with knowledge or sufficient fact to put the bailor on notice.

[Plummer v. Hardison, et al.]

2. *Same; Evidence; Affirmative Charge.*—Where the evidence did not sustain the plea of limitation as to all of the defendants, it was error to affirmatively instruct for all the defendants.

3. *Same; Time of Conversion.*—Although a defendant was a party to the wrongful conversion of the saw mill, his act in afterwards hiring to the owner to keep possession of such sawmill for such owner restored the possession to the owner, and a subsequent conversion ·by the defendant was a new conversion as to which the statute of limitations did not begin to run until it was committed.

4. *Bailments; Estoppel of Bailee.*—The bailee who accepts employment for compensation to keep possession of property cannot show as a defense to an action against him for its conversion that he repudiated his trust, and was holding possession for himself.

5. *Trover; Nature of Action.*—Trover is a special action of trespass on the case for damages for the wrongful conversion of personal property to another's use.

6. *Same; Exemplary Damages.*—Where a conversion of property is accompanied by acts of outrage or insult, the jury in its discretion may award exemplary damages.

7. *Same; Damages; Mitigation.*—The return of property wrongfully converted to its rightful owner may be shown in mitigation of damages.

APPEAL from Tuscaloosa County Court.

Heard before Hon. W. B. OLIVER, Special Judge.

Trover by Theodore Plummer against L. B. Hardison and others. Judgment 'for defendants and plaintiff appeals. Reversed and remanded.

JONES & PENICK, for appellant. The court erred in giving the charge requested by the defendant, as it was not shown that the statute of limitations had run against all the defendants.

G. B. WORTHEN, for appellee. As to what constitutes the conversion see *Trueman v. Scurlock,* 27 Ala. 407; *Bolling v. Kirby,* 90 Ala. 221. The evidence disclosed that the statute of limitations had run, and the court properly directed a verdict for defendant.

PER CURIAM.—1. In an action of trover brought by a bailor against his bailee, the statute of limitations

does not begin to run in favor of the bailee against the bailor until the bailee, to the knowledge of the bailor, does some act in repudiation of the bailment. Until the bailor has notice—or at least facts putting him on notice—to the contrary, he has a right to presume that the possession by the bailee, if he continues in possession, is in accordance with the terms of the bailment.— *Knight v. Bell's Adm'r*, 22 Ala. 198; *Benje v. Creagh's Adm'r*, 21 Ala. 151; *Cooper v. Cooper*, 132 Ill. 80, 23 N. E. 246. In the present case Hardison, one of the defendants (one of the appellees here), was, according to the evidence, in possession of the property described in the complaint as a bailee *for hire* for the plaintiff (appellant here) up to November 28, 1904, *less* than six years before the commencement of this suit. The evidence also showed that while the plaintiff knew that Hardison was in possession of the property up to November 28, 1904, and paid him for being in the possessin of the property up to that time, the plaintiff did not know and was in possession of *no* fact tending to show that Hardison prior to November 28, 1904, had repudiated the terms of the bailment on which he held the property for plaintiff, or that his possession of the property was inconsistent with or antagonistic to the rights and the possession of the plaintiff. We preface this opinion with the above statement because we think that the legal principle above announced and the evidence above stated are of vital importance, and that they, in large measure, must control the action of this court in passing upon the only question presented by this record.

All of the evidence shows that Hardison was employed by the plaintiff to keep possession of the property described in the complaint for *him,* and as the evidence shows, without dispute, that the plaintiff paid Hardi-

son $1 per day for keeping possession of the property for *him* for the first 28 days of November, and as Hardison accepted the money for *that* service, we are not able to see how *Hardison* can in this action be allowed to show as a defense for *himself* to this action that during the period for which he was so paid he had repudiated his trust and was holding the property for *himself* or for others. He cannot, we think, be thus allowed to blow hot and cold in the same transaction.

2. This is, as we have already indicated, an action of trover. It was brought by the plaintiff, Plummer, against *Hardison* and B. F. Carloss in his individual capacity and as surviving partner of the partnership of Forbes & Carloss. There was filed by the defendants *jointly* a plea, among others, of the statute of limitations of six years. The case was tried by a jury, and the jury returned into court the following verdict: "We, the jury in within case, believe from the evidence that the plaintiff is barred by the statute of limitations, and therefore find for the defendant." Thereupon a judgment upon the above verdict was rendered by the court, and the plaintiff appeals.

As the jury, by their verdict found for *all* the defendants on the plea of the statute of limitations, our consideration of this case will be confined to the evidence tending to establish that plea and to the charge of the court on that subject.

3. The evidence, without dispute, shows that the plaintiff in September, 1904, bought a sawmill at a mortgage sale. The mill was situated in Tuscaloosa county, and Hardison, one of the defendants, lived near the mill. The plaintiff lived in St. Louis, Mo., and his attorney lived in the city of Tuscaloosa. On the day that plaintiff bought the mill he, through his attorney, placed *Hardison* in possession of the mill, with the understand-

ing and agreement on the part of Hardison that he, *Hardison*, would keep possession of the mill for the plaintiff, protect it from trespasses, and watch it during the daytime and for his services in so doing *Hardison* was to receive $1 per day, and *Hardison* did receive for *that* service from that time until November 28, 1904, $1 per day from the plaintiff. The mill referred to was not in operation when the plaintiff bought it, and it was never operated by the plaintiff, and, to be specific, it was operated at no time between the purchase by the plaintiff in September and the termination of Hardison's contract with the plaintiff on November 28, 1904. Some time in the early fall of 1904—prior, we presume, to October 6th—Forbes & Carloss, who laid claim to the mill, met the attorney of appellant in the city of Tuscaloosa, and undertook to settle the conflicting claims of the plaintiff and Forbes & Carloss to the mill. At that meeting Forbes & Carloss were present with their counsel, *Hardison* was present, and the plaintiff was present through his counsel. There is a dispute as to whether that meeting resulted in any agreement whatever. Plaintiff's evidence tends to show that it did not, while the evidence for the defendant tends to show that the plaintiff surrendered his claims to the mill, and that it was agreed that it was the property of Forbes & Carloss. However that may be, there is *one* fact about which there is *no* contradiction. At the concluson of *that* meeting the plaintiff, to use the language of *Hardison*, as it appears in the bill of exceptions, "directed him, *Hardison*, to *continue* holding the property as the *agent of Theodore Plummer*, and that *he did so up to the* 28th *day of November*, 1904, and that the said Jones [plaintiff's attorney] as agent for the said *Plummer*, *paid him* for his said services up to *that date*."

34 CA

It appears that on October 6, 1904, Forbes & Carloss in some way got possession of an edger, a piece of machinery which was used in connection with the mill, but without which the mill was a complete mill, and which edger was standing up under the mill shed, and shipped it away. Subsequent to that time—and before November 28, 1904—*Hardison* informed the attorney of the plaintiff about this fact, but he said *nothing* to the plaintiff's attorney about any connection whatever that he, *Hardison,* had with reference to the disappearance of the edger, and said nothing indicating in the slightest that he had *consented to, connived at, or in any way aided or abetted* in the *removal* of the edger. He must have done so, however, for in May, 1905, the plaintiff brought an action of trover against *Hardison* and Forbes & Carloss for the value of the .edger, all the defendants appeared and contested the plaintiff's right to recover, but the plaintiff recovered a judgment against all of the defendants for the value of the edger.

Not only does the evidence for the plaintiff and the evidence of Hardison show that Hardison at no time prior to November 28, 1904, occupied any relation to the property described in the complaint *to the knowledge of plaintiff* other than that of *bailee* for the *plaintiff,* but all the other evidence in the case strengthens this view.   In examining one of the defendants—Carloss— the defendants, for the purpose of contradicting the attorney for the plaintiff, elicited from the said Carloss that after the interview in Tuscaloosa in which the defendants claim that the plaintiff surrendered his claim to the mill, and agreed that it was to be the property of Forbes & Carloss, and after the 28th of November, 1904, when plaintiff paid *Hardison* for keeping possession of and guarding the mill, the attorney for plaintiff came to his office in Reform, and "demanded of him

that Forbes & Carloss should pay the amount which the said Jones had paid L. B. Hardison for taking care of said property after said interview; * * * that said Forbes & Carloss ought to pay this amount because they had gotten the benefit of Hardison's services, and that he, Jones, had paid the money for the reason that he *forgot* at the proper time to *tell Hardison* not to take care of the property any longer, and that, unless Forbes & Carloss refunded it, he, Jones, would have to lose it; that he declined to pay the money, stating that it was *no affair* of Forbes & Carloss; that he told Mr. Jones that they had lost several thousand dollars on the deal, and did not see why they should pay this; that it was Mr. Jones' oversight, and that he did not think Forbes & Carloss got any benefit from it." While, as we have said, this testimony was contradictory of a part of the testimony of Jones, it shows that, whether *designedly* or *not,* whether through *mistake or otherwise, Hardison's* connection with the property up to November 28, 1904, was *no* affair of *Forbes & Carloss,* but *was* an affair of the *plaintiff* in this case. While the theory of the *defendants* is that the conversion of the edger on October 6, 1904, was the assumption by them of dominion over the entire mill and a conversion by them of the entire mill on that day, and that, therefore, the conversion by the defendants occurred *more* than six years before the bringing of this suit, nevertheless *Hardison's* relations with plaintiff with reference to the mill and plaintiff's knowledge as to what Hardison actually did with that property was such that the statute of limitations *certainly* as to *Hardison,* one of the defendants did not commence to run until November 28, 1904, less than six years before the bringing of this suit. Hardison did, as subsequent events must have shown, participate in the conversion of the edger, but the evi-

·dence *affirmatively* shows that plaintiff knew *nothing* of it until after November 28, 1904, and *all* the evidence .shows that, so far as plaintiff's knowledge went, *Hardison* was in the possession of the mill as plaintiff's bailee up to said November 28, 1904. This being true, the statute of limitations, as above said, certainly as to Hardison, did not commence to run against the plaintiff until November 28, 1904. While the taking of the edger by Forbes & Carloss on October 6, 1904, might have, *as between Forbes & Carloss and the plaintiff,* amounted to a conversion of the entire mill (a question which it is not necessary for us to decide), that act in *no* way inured to the benefit of Hardison, who confessedly had no right to or claim upon the mill except as the bailee ·of plaintiff, and who, as the *bailee* of the plaintiff, for *hire,* remained in the possession of the mill for the plaintiff *until* November 28, 1904. Hardison's own testimony shows that he laid no claim to the mill, but that he was in possession of the mill for the plaintiff up to November 28, 1904. If this suit had been instituted against Hardison alone—if he had been the *sole* defendant—undoubtedly, under the evidence in this case, the plaintiff would have been entitled to the general affirmative charge on the subject of the statute of limitations ·of six years. The evidence all shows *affirmatively* that *Hardison* was not guilty of converting the property described in the complaint until after November 28, 1904.

4. We discard from consideration all evidence tending to show that at the meeting between Forbes & Carloss, plaintiff's attorney, and Hardison in the city of Tuscaloosa a definite agreemnt was reached between the parties that the mill was to be from that time the prop-·erty of Forbes & Carloss. If *that* was true, then the mill from that time was, as between plaintiff and Forbes .& Carloss, the property of Forbes & Carloss. That the-

ory of the defendants was exploded by the special verdict of the jury to which we have above referred, and for that reason that phase of the evidence should receive no attention at our hands. The mill, when plaintiff bought it, appears to have been abandoned. It was idle and was situated upon a small piece of leased land. No one was living at the mill, and plaintiff did not undertake to operate it. Hardison lived near the mill, and the only possesion that he had of the mill was such possession as he, as the representative of the plaintiff, who had bought it and had some sort of title to it, obtained by its being turned over to him by the plaintiff and by his visits to the mill. Hardison testified that he did not visit the mill daily, but he also testified that he never saw Forbes or Carloss at the mill, but that he frequently saw Carloss at his, Hardison's, house during the fall and winter of 1904. In fact, he appears to have been working for Forbes & Carloss in the logging business at the time he had superintendence and control over the mill for the plaintiff.

The only theory upon which the jury could, under the evidence, have arrived at the conclusion that the claim of the plaintiff was barred by the statute of limitations of six years, was that, when *Forbes & Carloss* took from the mill the edger, they in fact at that time took possession of the entire mill with the intent to convert it to their own use; that, in fact, the conversion of the entire property by Forbes & Carloss then took place; and that as this occurred on or about October 6, 1904, more than six years before this suit was brought, plaintiff's claim was therefore barred by the statute of limitations of six years. In the conversion of the edger, Hardison, as events afterwards disclosed, participated, but his participation in the conversion was not, according to all the testimony and all of the tendencies of the

testimony, known to the plaintiff until after November 28, 1904, and, so far as he is concerned, that conversion could not have been, as against the plaintiff, with the intent to convert the entire mill. *After* the removal of the edger on or about October 6, 1904, Hardison was in the possession of all of the rest of the mill, the property involved in this suit, as a *bailee for hire* for the plaintiff, and certainly no conversion by *Hardison,* or in which *Hardison participated,* of the mill, according to Hardison's own testimony, could possibly, as between Hardison and the plaintiff, have occurred prior to November 28, 1904. The plea of the statute of limitations was a *joint* plea filed by all the defendants.

The evidence certainly failed to sustain the plea as to *all* the defendants, and the trial court, therefore, committed reversible error in giving to the jury at the written request of the defendant charge 6. If all the evidence is to be believed, the plaintiff could not have maintained an action of trover against Hardison for the property described in the complaint until after November 28, 1904.

5. An action of trover is, in reality, nothing but a special action of trespass on the case provided by the law for the recovery of the damages which are suffered by one in the possession of personal property which is wrongfully converted by another to his own use.

This action, like all other actions of trespass on the case, is an equitable action, and in this action, as in other such actions, the damages may be mitigated or aggravated according to the circumstances of the particular case, and, when the wrongful conversion is accompanied by acts of outrage, insult, or other misconduct of the wrongdoer justifying their imposition, exemplary damages at the discretion of the jury may be imposed upon the wrongdoer.

[Plummer v. Hardison, et al.]

For this reason, it has ever been the law that when property has been wrongfully converted, and after such conversion such property again comes into the possession of its owner, this fact may be shown by the wrongdoer, if the owner of the property brings an action in trover against him for such conversion, not as a *complete* defense to the action, but in *mitigation* of damages. Of course, when property which has been wrongfully converted again comes into the possession of its rightful, legal owner, and the owner elects to keep it, that property is as much the property of the true owner as if it had never been converted. The owner still has his action of trover against the wrongdoer, but, as above stated, the fact that he is again possessed of the property and its value at the time he regained it are all relevant on the question as to what damages the owner suffered by reason of the conversion. The wrongful conversion of personal property is an offense against the *possession*, and if, after a wrongful conversion of personal property is once had, the owner again becomes *possessed* of the property and the same wrongdoer again wrongfully converts the property to his own use, this is a *new* offense against the possession of the owner, and as to this *new act* of wrongful conversion the statute of limitations does not, of course, begin to run until the second conversion actually takes place. If A. steals my hog, carries him away without my knowledge or consent, and puts him in his pen, A. is guilty of larceny. If, before he kills my hog, I find the hog and take him back to my lot, and put him in my lot, and A. again comes to my lot and again steals my hog, A. is guilty of another and distinct larceny of my hog. The statute of limitations, as to each of the above larcenies, commences at the time each was respectively committed.

As Hardison, after the conversion of the edger, was in the possession of the property described in the complaint as bailee for the plaintiff, and was paid by the plaintiff for so being in possession as bailee, certainly, as between Hardison and the plaintiff, the plaintiff was in the rightful possession of the property described in the complaint after the conversion of the edger, and although Hardison might have participated in the conversion of the edger with the intent to aid and abet Forbes & Carloss in converting the entire mill, nevertheless his subsequent acts and acceptance of plaintiff's money certainly, as between him and the plaintiff, repossessed the plaintiff of the property, and if, after the termination of the bailment, Hardison again so conducted himself with reference to the property as to render himself liable to the plaintiff in an action of trover for its conversion, this act of conversion did not relate back to the time of the conversion of the edger, but was a *new* conversion, and the statute of limitations as to this new conversion did not begin to run until the new conversion was actually committed.

We think in the above opinion we have sufficiently indicated to the trial court our views as to the legal principles which should govern it upon the next trial of this case, if one is had.

Reversed and remanded.

NOTE.—The foregoing opinion was prepared by Judge DE GRAFFENRIED while he was a judge of this court, and is adopted by the court.