# MORRIS vs. HALL.

[TROVER FOR CONVERSION OF COTTON.]

1. *General charge on evidence.*—Repeated decisions of this court have established the propositions, that a general charge on the effect of the evidence, in favor of either party, is equivalent to a demurrer to the evidence; and that such a charge should never be given, where there is any conflict in the evidence on a material point; nor where it is necessary to draw an inference of fact, which the jury only can draw from the evidence, and which does not arise as a legal presumption from the facts· proved; nor where the evidence only tends to prove the facts on which such charge is based; and the court is now prohibited by statute, (Code, § 2274; Revised Code, § 2678,) from giving such a charge, *ex mero motu,* in any case.

2. *Purchase of cotton by foreign bank, during late war, with Confederate States treasury-notes; validity of contract.*—The purchase of cotton by a foreign banking corporation, in this State, is not an exercise of "the privilege of banking," within the meaning of section 939 of the Code, (Revised Code, § 1176,) which requires such corporations to exercise. that 'privilege "by the exclusive use of gold and silver coin and bank-bills issued by authority of this State;" consequently, the contract for such purchase is not void under the provisions of that statute, because the price was agreed to be paid, and was paid, in treasury-notes of the Confederate States; but such contract is' void under the laws of the United States, and the proclamations of the president issued in conformity thereto, (12 U. S. Statutes at large, 257, 1264, 1267,) when shown to have been made in Alabama, in December, 1862, after the capture of New Orleans by the Federal forces, by a banking corporation which was chartered under the laws of Louisiana, and which was located in New Orleans.

3. *Extra-territorial contract by corporation.*—*Semble,* that a corporation can not do any act, nor make any contract, outside of the limits of the State by which it is created, unless the power to do so is expressly conferred by its charter.

4. *Delivery of possession under invalid contract; estoppel en pais.*—If the vendor of a chattel receives payment of the purchase-money, and delivers possession of the property to the purchaser, he can not be heard, in a court of law, to assert the invalidity of the contract as a ground of recovery, whether such invalidity arises from the illegality of the consideration, or from the legal incapacity of the purchaser to make the contract.

5. *Replevy of attached property by stranger; liability of person replevying in trover, and what defenses he may make.*—When attached property is

Morris v. Hall.

replevied by a stranger, for the defendant, (Code, § 2536; Revised Code, § 2964,) and the person so replevying is sued in trover, he may set up any defense that would be available to the defendant in attachment; and if he so replevies the property in good faith, without any knowledge or notice of the title of the real owner, and afterwards holds in subordination to the bailment, and does no act inconsistent with his duty as such bailee, he is not liable in trover.

APPEAL from the City Court of Montgomery.
Tried before the Hon. THOS. M. ARRINGTON.

THIS action was brought by William B. Hall, against Josiah Morris, W. C. Ray, A. F. Given, E. H. Metcalf, and D. Browder, to recover damages for the conversion of one hundred and twenty-five bales of cotton; and was commenced on the 19th January, 1866. The defendants severally pleaded the general issue, "in short by consent, with leave to give in evidence any matter that might be admissible under that issue, or under any special plea in bar; and the plaintiff joined issue, with like leave to give in evidence any matter that could be legally admitted, in avoidance or rebuttal of any matter which might be shown in evidence by the defendants." The cotton in controversy was sold by the plaintiff, through Edmund Harrison, his agent and commission-merchant, in Montgomery, in December, 1862, to W. C. Ray, a cotton-broker, who bought it for one Steever, as agent for the Bank of Louisiana; the agreed price being fifteen cents per pound, and the entire purchase-money being paid at the time, in Confederate States treasury-notes. By agreement between the parties to the contract, the cotton remained on the plaintiff's premises, where it was at the time of the sale; and an attachment was there levied on it, in July, 1865, as the property of the bank, at the suit of one Edward H. Wilson. In January, 1866, the defendant Morris replevied the cotton; and his co-defendants, Ray, Given, Metcalf, and Browder, were his sureties on the replevin bond. The proceedings in said attachment suit, which were read in evidence on the trial, are hereinafter more particularly described. On the trial, at the June term, 1867, there was a judgment on verdict for the plaintiff; but, on a subsequent day of the term, the court granted a new trial, as to all the defendants except Morris.

"On the trial," as the bill of exceptions states, " the
plaintiff testified as a witness, that he was a resident citi-
zen of Lowndes county, Alabama, and had resided there
before, during, and since the war between the United States
and the Confederate States; that on the 6th December,
1862, (while he was absent in the service of the Confeder-
ate States,) he sold one hundred and thirty-four bales of
ginned cotton, being all of his crop raised in the year 1862,
and being by itself in a shed on his plantation, through
Edmund Harrison, his agent and commission-merchant,
then doing business in the city of Montgomery; that the
agreed price was fifteen cents per pound, and the aggregate
amount $11,088.30, the aggregate weight of the cotton be-
ing 73,922 pounds; which cotton, as he understood from
said Harrison, was sold to W. C. Ray, a cotton-broker, for
one Steever, who, in said purchase, was agent for the Bank
of Louisiana, located at New Orleans; and said Ray paid
to said Harrison, at the time of said purchase, the amount
of said purchase-money, in Confederate States treasury-
notes; which notes were received by said Harrison, and
were afterwards paid over by him to plaintiff. Said plain-
tiff further testified, that the price paid for said cotton was
the usual market price for cotton of that quality at the time
of the sale, and that he was satisfied with the sale; also,
that it was understood that the cotton should remain where
it was, at the risk of the bank, until called for by the bank,
and he was to see that proper care was taken of it while
there; also, that if it had been burned, it would have been,
in his opinion, the loss of the bank, and not his. He fur-
ther testified, that afterwards, about the 12th July, 1865,
F. C. Randolph called on him, in Lowndes county, and
asked if the Bank of Louisiana had not some cotton on
his premises; that he replied in the affirmative; that Ran-
dolph then said, he had a writ of attachment against said
bank, in favor of Edward H. Wilson, which he had come
to levy on said cotton, as the property of the bank, and
asked him (witness) to point out the cotton; that he agreed
to do so, but first requested Randolph to go and take din-
ner with him, and that they would then go down to the shed
near the river, where the cotton was, about three miles from

Morris v. Hall.

his residence, and he would point out the cotton; that they both rode down to the place after dinner, and he pointed out the cotton; that Randolph rode around it, and said he levied on it, and asked him to see that it was not interfered with; that he agreed to do so; that said Wilson afterwards sent down an agent to look after and care for the cotton, and made an arrangement with witness himself to guard it; that the defendant Morris, after replevying the cotton, sent him a note, stating that he would pay for guarding the cotton, and for putting it in order, and requesting him (witness) to have it moved to the river bank, after it was repaired, for shipment by steamboat; that he (witness) did so, and for which said Morris afterwards, on the 28th May, 1866, paid him the sum of four hundred and twenty-five dollars and twenty-five cents, in United States currency. The receipt for said amount was shown to said Hall, and was read to the jury, after being proved by him, as follows." The receipt, as set out in the bill of exceptions, is signed "W. B. Hall, by T. Douglass, agent;" and one of the items specified in the account is, "T. Douglass' attention to cotton, $90."

"Said Hall further testified, that said Douglass, while guarding and attending to said cotton, was in his employment, and was duly authorized by him to collect from said Morris the money mentioned in said receipt, and to sign said receipt; that he (witness) knew, at the time of the repairing and hauling of said cotton mentioned in said receipt, that said Morris had replevied said cotton under the levy made by said Randolph, and the orders of the circuit court of Montgomery, in the said suit of E. H. Wilson against the Bank of Louisiana, (as hereinafter more fully appears,) and that said Morris neither had nor claimed any right to said cotton, or any control over it, other than such as he derived and acquired from his having replevied the same in said suit. Said Hall further testified, that when he came home from the army, in 1863, he was fully informed by said Harrison of said sale to Ray, and of the terms of said sale, and of all the facts relating to it; that thereupon, with a full knowledge of all these matters, he ratified and approved the said sale, and received and enjoyed the ben-

efit of the proceeds thereof, and had never returned, nor offered to return, any part of the proceeds of said sale; that from the time he first heard of said sale, until some few days before the commencement of this suit, he had uniformly and frequently spoken of said cotton as the property of said bank, and had so regarded it; that he had never paid any internal-revenue tax, or other tax on it, but the same had been paid by the bank, or by those acting or claiming under it; that he was informed by an attorney-at-law, a few days before the commencement of this suit, that, as the Bank of Louisiana was located at New Orleans, and continued its business there after the capture of that city by the United States forces, the sale to said bank was illegal and void, and he could probably recover the cotton by suit; that he commenced this suit on such information; that on the morning of the commencement of the suit, but before the issue of the summons and complaint, a demand for said cotton was made by his authorized agent, of said Morris, plaintiff claiming it as his own at the time; that said Morris thereupon refused to deliver it, and stated that, as he held the cotton under said replevy, he could not deliver it to said plaintiff or his agent; that this suit was thereupon immediately commenced; that said cotton had never been out of his possession, from the time it was ginned and packed into bales, until it was taken by said F. C. Randolph as aforesaid, otherwise than is shown in this bill of exceptions; and that no actual delivery of the cotton had ever been made to the Bank of Louisiana, or its agents, otherwise than is shown in this bill of exceptions."

The plaintiff then read in evidence the depositions of Henry Shepherd and John F. Irwin; the former of whom was a director in the Bank of Louisiana, after the capture of New Orleans by the United States forces, in April, 1862; while the latter was a clerk in said bank at that time, and was elected cashier in March, 1864. Both of these witnesses testified, that after the capture of New Orleans, on the 28th April, 1862, the bank ceased its regular banking business; that all the business afterwards transacted by it, was done with a view to the liquidation and settlement of

its affairs, and that its charter had never been declared forfeited.

" The plaintiff then introduced said Edmund Harrison as a witness, who testified as follows : 'Before the 6th December, 1862, it was communicated to him by plaintiff's agent, that plaintiff had one hundred and thirty-four bales of cotton, which were piled up under a shelter on his plantation in Lowndes county, and which he (witness), as plaintiff's agent and commission-merchant, was authorized and requested by plaintiff to sell by sample, for Confederate treasury-notes, to any person who would buy and take them as they were under the shelter, in accordance with the usage and custom in such cases at the time ; and, in puruance of the authority given to him, he sold said bales of cotton, which weighed in the aggregate, seventy-three thousand nine hundred and twenty-two (73,922) pounds, on the 6th December, 1862, to W. C. Ray, a cotton-broker, in the city of Montgomery, who bought the same for the Bank of Louisiana, at the price of fifteen cents per ₁pound, as the same were under said shelter, and who, on said day, paid witness in full therefor, to-wit, $11,088.30. At the time of said sale and payment, in pursuance of the authority given to him by plaintiff, and in accordance with the usage and custom in such cases, witness delivered to said Ray, acting for said bank as aforesaid, the samples of said cotton, (by which samples the sale had been made,) and exe- ecuted and delivered to said Ray, acting for said bank, an instrument in writing, which, in substance, set forth the sale and payment aforesaid, and contained a provision, in addition theretc, "᠄ ᠈t said bales of cotton were to remain under said shelter, and be held and kept there as the property of said bank, and at the risk of said bank, subject to the order or removal of said bank or its agent ; and said cotton was to be delivered by plaintiff, whenever called for by said bank or its agent. Very soon afterwards, the said transaction, including said sale, payment, and substance of said writing by witness for plaintiff, was duly reported to plaintiff, and was approved by him not long afterwards ; and the money so received by witness was accounted for by him, and paid over to plaintiff, who received the same with-

out objection. Said witness testified, also, that said cotton was worth, on the 19th January, 1866, in lawful money of the United States, from thirty to forty-five cents per pound.

"The plaintiff also introduced T. Douglass as a witness, who testified, that he was plaintiff's agent to do the work specified in the receipt above set out, and was in his employment; that he was duly authorized by plaintiff to execute said receipt in his name, and to receive the money specified in said receipt; that the labor and service therein specified, had been done and performed as therein specified; that he was doing business for plaintiff at the time of the sale of said cotton, and continued in his employment up to the time of the trial; that from the time of the sale of said cotton, to the 19th January, 1866, plaintiff uniformly spoke of said cotton, and treated it, as the property of said bank; that he never heard plaintiff set up any claim to it in any wise; that it was kept under shelter, by itself, from the time of said sale, until hauled away at the request of said Morris; that he, having said cotton under his care during the plaintiff's absence in the military service of the Confederate States, regarded and treated it as the property of said bank; that the plaintiff paid no tax on said cotton after said sale, but the same was paid by the agent of said bank. Said witness further stated, that on the written request of said Morris, made to said plaintiff, he, by the direction of said plaintiff, caused said cotton to be hauled to the landing on the river, for shipment by said Morris, who caused the same to be shipped from said landing; that it was hauled there for said Morris, who claimed it under his replevy; that the said claim of said Morris was yielded to by plaintiff without objection, and said cotton was hauled by plaintiff for said Morris, for the compensation paid by said Morris as aforesaid.

"The defendants introduced as a witness W. C. Ray, who was one of the defendants, and who testified, that on the 6th December, 1862, having been requested to purchase some cotton for the Bank of Louisiana, he, as broker and agent for said bank, purchased from said plaintiff, through his agent and commission-merchant, Edmund Harrison,

one hundred and thirty-four bales of cotton, at fifteen cents per pound; that the sale was made in the city of Montgomery, by samples; that the aggregate weight of said cotton was 73,922 pounds, and he paid for it, in Confederate States treasury-notes, the sum of $11,088.30; that said bales of cotton were on plaintiff's plantation, under a shelter by themselves; that said Harrison, as agent of plaintiff, executed to him the usual and customary writing, acknowledging the sale of said cotton, and the receipt of said money from the bank, and agreeing that the cotton should remain under said shelter, as the property of said bank, and at its risk, and subject to its order, said Hall to care for it while it remained, and to deliver it to the order of said bank; that there was no actual delivery to said bank, other than herein shown; that after the close of the war, and before any attachment had been levied on the cotton, some time in 1865, said witness, in company with Mr. Steever, the agent of said bank, went around to see the cotton purchased for said bank, to examine into its condition, and to see what repairs were necessary to put it in good condition for shipping; that they saw the plaintiff, and made inquiry of him as to said one hundred and thirty-four bales, and told him their object was to see what it would cost to put it in repair; that plaintiff informed them of the condition of the cotton, spoke of it as the cotton of the bank, laid no claim whatever to it, expressed a willingness to have it repaired, at a reasonable cost to the bank, and said that he would deliver it to the bank when called for; that no agreement was made at the time, as they were some distance from where the cotton was, and they did not see it at that time; that the cotton was levied on soon afterwards, as the property of the bank, and he (witness) took no further steps in relation to it, and never interfered with it afterwards; that the samples of said bales were delivered to him at the time of said sale, but no actual delivery of the cotton was made, unless what is shown in this bill of exceptions is equivalent to such delivery.

"Josiah Morris, one of said defendants, was next introduced by the defendants, and testified, that he replevied said cotton on or about the 8th January, 1866: that he ad-

dressed a note, immediately afterwards, to plaintiff, requesting him to put said cotton in order, and to haul it to the river, for shipment by said Morris, who had replevied it under the attachment of E. H. Wilson against said bank; that plaintiff consented to do so, and proceeded to put said cotton in repair, and to haul it to the river, and place it in the possession of said Morris; that said Morris afterwards paid plaintiff for it, upon his demand, as shown by the receipt above set forth in the testimony of said Hall; that said Hall never set up any claim to said cotton, nor gave witness any intimation that he intended to claim it, until the day on which this suit was instituted, and just before it was instituted, but acknowledged and treated said cotton as the property of said bank; that he (witness), as the party replevying said cotton, paid said Hall, soon after the commencement of this suit, the money mentioned in said receipt, for the services therein mentioned, which were rendered at the dates therein shown; that in order to protect said cotton, and preserve it subject to his bailment, as the person who had replevied it, he had incurred heavy expenses in insurance, taxes, guarding, freight, &c.; and that he had refused to deliver it up, on the demand of plaintiff through his agent, Mr. Randolph.

"The defendants then read in evidence a transcript, duly certified, of all the papers, orders, bonds, and proceedings in the circuit court of Montgomery, in the said attachment suit therein pending, wherein said Edward H. Wilson is plaintiff, and said Bank of Louisiana is defendant;" which transcript is copied into the bill of exceptions. The attachment in said suit was issued on the 10th July, 1865, by J. H. Nettles, a justice of the peace in and for Montgomery county, under the authority of an order from Major-General A. J. Smith, who was then in command of the sixteenth corps of the United States army, with his headquarters at Montgomery; which order was addressed to "J. H. Nettles, justice of the peace in and for Montgomery county," and was in these words: "You are hereby authorized to issue a writ of attachment, at the suit of E. H. Wilson, against the Bank of Louisiana, and appoint the necessary bailiffs to execute the necessary process, levying

the same upon any property of said bank within your jurisdiction, upon proper affidavits and bond being filed with you. You will make the writ returnable to the first properly organized court under the laws of the United States, having jurisdiction in such cases." The affidavit for the attachment was made by the plaintiff, before said Nettles; and stated, as the ground on which the attachment was sued out, that the defendant had not sufficient property in Louisiana, with which to satisfy the plaintiff's debt. The usual statutory bond was given by the plaintiff, and the attachment was made returnable to the next term of the circuit court of Montgomery county. The plaintiff's demand, as stated in his affidavit for the attachment, was "the sum of ninety-three thousand four hundred and twelve 50-100 dollars, in coin, after allowing all off-sets and discounts." W. H. Ogbourne was appointed bailiff by said Nettles to execute said attachment in Montgomery county, and F. C. Randolph was appointed bailiff to execute branch writs, which were issued to Autauga and Lowndes counties. The order appointing said Randolph was as follows: "You are hereby appointed a bailiff to execute and return the branch writ of attachment in said cause, in the counties of Lowndes and Autauga. You will execute and return the same according to law and the precept thereof. You are appointed under authority vested in me by the order of Major-General A. J. Smith, commanding 16th army corps U. S." The attachment was levied by said Ogbourne, on the 11th July, 1865, on thirty-four bales of cotton on the plantation of A. W. McDade, one hundred and ninety-eight bales on the plantation of J. C. B. Mitchell, and thirty-seven bales on the plantation of W. E. Lucas, all in Montgomery county. The branch writ to Autauga was levied by said Randolph, on the 12th July, 1865, on one hundred and five bales of cotton on the plantation of T. F. Friths, fifty-three bales on the plantation of Mrs. M. F. Pope, and fifty-nine bales on the plantation of A. J. Pickett, deceased; and the branch writ to Lowndes county was levied by said Randolph, on said 12th July, 1865, on one hundred and thirty-four bales of cotton on the plantation of W. B. Hall,

(the plaintiff in this suit,) and also on fifty bales on the plantation of J. Bragg in said county.

At the fall term, 1865, of said circuit court, the plaintiff filed his complaint in said attachment suit. The complaint contained three counts; the first count being founded on four bills of exchange, which were therein set out in full, together with the contract in writing between said Wilson and the cashier of said bank, under which said Wilson received said bills of exchange; the second count being also founded on the non-payment of the said bills of exchange, and alleging an excuse for the failure to protest the same; and the third being the common money counts combined. The bills of exchange were all dated at New Orleans, 11th October, 1862; were drawn by "Aug. Montrieul, cashier," on "R. M. Davis, president, Columbus, Georgia," payable at sight, "in coin," to the order of E. H. Wilson; three of them being for twenty-five thousand dollars each, and the fourth for thirty-five hundred and eighty-one 62-100 dollars. The contract under which said Wilson received said bills of exchange, which was also dated New Orleans, October 11, 1862, requires no special notice.

At the December term, 1866, Martin & Sayre, attorneys-at-law, as *amici curiæ*, moved the court to dismiss the attachment, on the ground that said Nettles had no authority to issue it, and also to dismiss the levies, on the ground that the bailiffs had no authority to make them; both of which motions were overruled by the court. At the same term of the court, it was ordered, on motion of the plaintiff, that the cotton be delivered by the bailiffs into the possession of the sheriffs of the several counties in which it was, and directing the sheriffs to sell it as perishable property; and, on a subsequent day of the term, it was further ordered, " that the several sheriffs allow the right to replevy, if good and sufficient bond or bonds for that purpose shall be offered." Under these orders, the cotton was delivered to the sheriffs of Montgomery, Lowndes, and Autauga counties; and it was replevied by the defendant Morris, as above stated, on the 10th January, 1866; the number of bales marked with the plaintiff's name being stated in the replevin bond to be one hundred and twenty-five. At the

May term, 1866, a plea in abatement was filed by the defendant, on the ground that the attachment was issued without authority of law, and that the levy thereof was also unauthorized and invalid. At the June term, 1867, as is shown by a bill of exceptions in the transcript, the court struck from the files, on motion, *four* pleas in abatement, which are said to have been filed by the defendant, but which are not copied in the record; and also sustained a demurrer to several special pleas in bar, none of which are set out. A trial was had at the same term, on issue joined on the plea of *non assumpsit*, which resulted in a verdict and judgment for the plaintiff.

"The foregoing was all the evidence introduced on the trial of the cause; and upon this evidence the counsel for the respective parties proceeded to discuss the questions thereon arising. The defendants' counsel closed his speech, by asking the court to charge the jury, that, if they believed all the evidence, they must find for the defendants. Whilst the counsel for the plaintiff, in the closing argument, was proceeding in this discussion, he took the position, that the sale by Harrison to said bank was illegal, and was neither accompanied nor followed by any actual delivery of the cotton, either to the bank, or to any one for it, on the part of the plaintiff; and that the contract of sale was therefore executory, and not executed, and could not avail the defendants as a bar to this action; and while he was arguing in favor of this position, the court interrupted him, and informed him that the court would charge the jury, that, if they believed all the evidence, they must find for the plaintiff, for the value of the cotton on the day of said demand on and refusal by said Morris, with interest thereon from that day up to the day of rendering their verdict. The plaintiff's counsel thereupon stopped his argument, and the court gave said charge to the jury; to which charge, thus given, the defendants severally excepted."

The appeal is sued out by the defendant Morris, who assigns as error the charge to the jury, the final judgment, and the order refusing to grant him a new trial.

34

Morris v. Hall.

RICE, SEMPLE & GOLDTHWAITE, and CHILTON & THORINGTON, for the appellant. (No briefs on file.)

WATTS & TROY, with whom were TYLER & RANDOLPH, *contra*, made the following points : 1. The contract between Hall and the Bank of Louisiana, made through their respective agents, was void, on several distinct grounds. In the first place, if buying cotton was a part of the bank's legitimate banking business, the contract was void under § 939 of the Code, (Revised Code, § 1176,) because the price was paid, and agreed to be paid, in treasury-notes of the Confederate States, whose issue was not authorized by the laws of Alabama; and if buying cotton was not a part of the bank's legitimate business, the contract was nevertheless void, because it was not shown that the bank's charter authorized it to make such a contract. As to the power of corporations to make such contracts, see Angell & Ames on Corporations, page 2; *Dartmouth College v. Woodward*, 4 Wheaton, 636. The *onus* of showing the authority of the bank to make the contract, was on those who asserted it. *City Council of Montgomery v. M. & W. P. R. R. Company*, 31 Ala. 76; *Grand Lodge v. Waddell*, 36 Ala. 313; *Bryan v. Carter*, 13 Peters, 129.

2. Said contract was void, for the further reason, that it was violative of the laws of war, and contrary to the public policy of the United States, as well as the proclamations of the president, and the express provisions of several acts of congress. The Bank of Louisiana was chartered under the laws of Louisiana, and was located at New Orleans; and that city was captured by the military forces of the United States, on the 25th April, 1862. By the laws of war, all the inhabitants of one belligerent nation are forbidden to hold commercial or other friendly intercourse with the subjects or inhabitants of the opposing belligerent power.—1 Kent's Commentaries, 67; *Griswold v. Waddington*, 16 John. 438; Wheaton's Law of Nations, 366, 372, 385–6; Story's Conflict of Laws, 246–7; *Williams v. Patterson*, 7 Taunton, 439; Chitty on Contracts, 181–83, 678; and Phillimore and Vattel, as cited in these authorities. A corporation is an inhabitant, within the meaning of this

rule of law.—2 Gallison, 105. The principle applies with peculiar force to the inhabitants of a conquered province or territory, during the progress of the war.—*Thirty Hogsheads of Sugar v. Boyle*, 9 Cranch; *Fleming v. Page*, 9 Howard; 1 Robinson's Adm. Rep. 196–208; 3 *ib.* 22; 1 Kent, 66–8; *United States v. Rice*, 4 Wheaton, 253; *Williams v. Patterson*, 7 Taunton, 439; *Prize Cases*, 2 Black, 635; *Mrs. Alexander's Cotton*, Wallace, —. Moreover, these principles of law were expressly declared and promulgated, as applicable to the inhabitants of any conquered territory during the late war in the United States, both by act of congress, and by the president in official proclamations.—12 U. S. Statutes at large, 257, 1262, 1264.

3. The contract being void, the Bank of Louisiana never acquired any title to the cotton by virtue of that contract. The actual possession and dominion of the cotton never passed from Hall. The delivery of the samples was but a constructive, or symbolic, delivery of the cotton; and there can be no constructive delivery under a contract which is illegal and void. The alleged bailment, growing out of Hall's agreement to hold the cotton for the bank, was founded on the same void contract, and could have no more validity or efficiency. Hall held the cotton as if no contract whatever had been made in reference to it.—*Harris v. Dodson*, 10 Ala. 566; *Hockaday v. Willis*, 1 Speer, 379; *Armstrong v. Toller*, 11 Wheaton.

4. A delivery of the cotton to the bank can not be argued from Hall's declarations to Randolph, when making the levy, and his accompanying acts, pointing out the cotton, &c. If Randolph had been a legal officer, with authority to make the levy, he certainly did not act as the agent of the bank in levying on the cotton; and if he was not a legal officer, or had no authority to make the levy, *(vide infra,)* he was a mere trespasser, and no right could grow out of his illegal act. The plaintiff's declarations to Randolph amounted to no more than the expression of an opinion, at that time entertained by him, that the cotton belonged to the bank.

5. The case presents none of the elements of an estoppel. To constitute an estoppel *en pais*, there must be—1st, mis-

representation by a party having knowledge of the facts;
2d, that the opposing party, having no knowledge of the
facts, and no means of information, was induced by these
misrepresentations to do what he would not otherwise have
done; and, 3d, that injury would not result from the asser-
tion of the truth.—*Pounds v. Richards*, 21 Ala. 424; *Steele
v. Adams*, 21 Ala. 534; *Commonwealth v. Moltz*, 10 Barr,
527.    None of these ingredients exist in this case: Morris
had all the information, when he replevied the cotton, which
the plaintiff ever had; he was not in any manner influ-
enced, in replevying it, by anything that the plaintiff had
said or done.    He can not occupy a better position, in any
respect, than the bank would have occupied, if it had re-
plevied the cotton; and it can not be contended that the
plaintiff would have been estopped from suing the bank,
by anything that he said or did at the time of the levy.
Suppose that Hall is estopped from recovering against
Morris, and that Wilson fails in his attachment suit; what
becomes of the cotton?    If Hall's consent to the levy, and
his subsequent act in hauling the cotton to the river, would
prevent him from maintaining trespass against the officer,
or against any one claiming under the levy, they can not
affect his right to recover in detinue or trover.—*Smith v.
Locke*, 4 Ala. 288; *Lindsay v. Bissell*, 9 Ala. 166; *Easley v.
Dye*, 14 Ala. 165; *Oden v. Stubblefield*, 2 Ala. 684.    On the
question of estoppel, see, also, *Miller v. Hampton*, 37 Ala.
342; *Hill v. Eply*, 31 Penn. St. 331.

6.  Randolph was, in fact, not a legal officer.    The pro-
cess was directed to "any sheriff," and could only be execu-
ted by a sheriff.    The justice of the peace, by whom the
attachment was issued, could not have authorized a con-
stable to execute it, because the amount in controversy ex-
ceeded the penalty of a constable's bond; nor could he, in
any case, authorize a constable, or any one else, to execute
it in another county.—*Gresham v. Leverett*, 10 Ala. 384;
*Pope v. Stout*, 1 Stewart, 375.

7.  The evidence justified the charge of the court; and
the court was authorized to charge on "the effect of the
evidence," because requested to do so by one of the parties.

That the charge was against the party who requested it, does not vary the case.

BYRD, J.—[1.] The plea of not guilty, to an action of trover, puts in issue every matter which can be pleaded in bar, except a release. The bill of exceptions shows, that all the evidence introduced on the trial is set out therein. The court charged the jury, "that, if they believed all the evidence, they must find for the plaintiff, for the value of the said cotton on the day of the said demand upon and refusal by said Morris, with interest on that value from the day of said demand, up to the day of rendering their verdict." The appellee contends, that the court did not err in giving the charge, for the following reasons: 1st, that the contract between Hall and the Bank of Louisiana was void, as being in violation of section 939 of the Code of Alabama, and of a law of the United States (vol. 12, p. 257,) and the proclamations of President Lincoln, (*ib.* 1262–64;) 2d, that it is not shown that the Bank of Louisiana had any authority under its charter to buy cotton, and therefore it acquired no title, nor did Hall part with his, by the sale to the agent of the bank.

The argument of counsel for the appellee is mainly addressed to these points, and to a consideration of those made by appellant's counsel. The latter contend, that the court erred in the charge given, upon the following grounds: 1st, that the sale was valid, and passed the legal title to the cotton, to the bank; 2d, that the appellee, upon the evidence, is estopped from setting up a title in himself, as against the appellant; 3d, that, conceding the contract of sale to be void, and that the bank could assert no title under it, yet, if there was a delivery of possession of the cotton to the bank, and subsequent actual possession of its agents, or of another who acted as an officer of the law, by the assent of appellee, under whom the appellant claims, the former can not maintain this action against the latter; and, 4th, that this action is not maintainable against appellant, who is a mere bailee of the law, and has done no act in violation of his duty as said bailee; in other words, that the evidence does not show that appellant has con-

verted the property. These points are extracted from the arguments of counsel, which, at the bar, and on their briefs, were elaborated with much earnestness, learning, and profound research. I do not deem it a duty to pass upon all the points argued by counsel, but will proceed to notice such as are decisive of this cause in this court.

It does not appear to me a matter of any consequence to *this* case, whether the person who endorsed the levy upon the attachment was an officer authorized to do so by law or not, or whether he acted with or without authority of law ; and this will be apparent from the further consideration of the questions involved in the charge given by the court below.

The nicety of this case requires at our hands a review of some of the numerous decisions touching this question, viz., when can a general affirmative charge be given or refused by the court, without subjecting its action to a reversal?

In the case of *Pope, adm'r, v. Robinson*, (1 Stew. 415,) only one witness was examined by the plaintiff; and " the court charged the jury, that, if they believed this evidence, in the opinion of the court, it supported the de ˉ ration ;" and this court held the charge a proper one. T evidence in that case was clear and explicit, and it was no necessary for the jury to infer that another fact existed, n order to find for the plaintiff.

In the case of *Paul v. Meek*, (6 Ala. 753,) both parties introduced evidence. The court charged the jury, that, if they believed the testimony of the defendant, they must find a verdict in his favor; and this court held, that the charge was properly given. It will be seen by reference to the case, that the evidence was positive, and involved no inferential facts.

In the case of *Costillo et al. v. Thompson*, (9 Ala. 937,) the court charged the jury, that, if they believed the evidence, they must find for the plaintiff. It appears from the report of the case, that the defendant only introduced a deed in evidence, and that the plaintiff introduced several deeds, and parol evidence tending to show fraud on the part of the defendant, Costillo. This court held, that " this intent [to commit a fraud] the court could not, of its own mere

Morris v. Hall.

motion, determine as matter of law; it was peculiarly a question of fact to be left to the jury."

In *Stewart v. Hood et al.*, (10 Ala. 600,) it appears that both parties examined witnesses, and the plaintiff asked the court to charge the jury, " that, from the evidence in this case, they must find for the plaintiff;" and this court held that the charge was properly refused, for the reason that the evidence " was not so certain and definite in its nature, or the conclusions to be drawn from it, as to warrant the court, as a matter of law, in charging the jury that it made out a case, either for the plaintiff, or for the defendants."

In *Boyd et al. v. McIvor*, (11 Ala. 822,) it will be seen by reference to the report of the case, that the plaintiff alone introduced testimony, and the court charged the jury, "that, if they believe all the evidence, they must find for the plaintiff;" and this court said, " We do not consider it necessary to determine whether such a case as this is one in which the court would compel the defendant to join in a demurrer to evidence, because, conceding it to be such, the court erred in its judgment." This case is in conformity with the rule, that the court can not properly, in every case, compel a plaintiff to join in a demurrer, tendered by the defendant, to the evidence of plaintiff; but, in some cases, it is the duty of the court to submit the case to the jury.

In *Bradford v. Marbury*, (12 Ala. 529,) the court, in speaking of a charge which passed on the fact of an assent by the plaintiff to a certain transaction, said : " Though we are not prepared to say this *must* be considered as an assent, it is possible the jury *might* so consider it;" and, " The objection to the request is, that the evidence bearing on this point is too indefinite and inconclusive to warrant the court in saying that one thing or another was proved by it."

In *McCall v. Doe, ex dem. Pryor*, (17 Ala. 533,) this court held, that when, on the trial of an ejectment, it is shown that one, upon whose mere presumptive title the plaintiff relies, left the possession of the land, the question whether or not he left it *animo revertendi* is for the consideration of

the jury, but the court may decide, whether or not, from the facts of the case, such a question arises.

In the case of *Thomas v. Degraffenreid*, (17 Ala. 602,) this court held, that the court, before which a cause is on trial before a jury, can not pass upon the effect of testimony, when the question to be determined is, whether or not an act was done with a fraudulent intent; and that whether there has been a delivery of a chattel, is not a conclusion of law, but a question of fact to be determined by the jury. See, also, *Lanier v. Br. Bank*, 18 Ala. 625.

In *McClung's Ex'rs v. Spotswood*, (19 Ala. 165,) the court, speaking of the sufficiency of evidence tending to prove an agency, said : "It was for the jury, and not for the court, to determine on the sufficiency of this evidence;" and further, that, " in most cases, where the authority is given by parol, the question whether the agent has exceeded his authority, is a question of fact to be decided by the jury, under the instructions of the court."

In *McKenzie v. Stevens*, (19 Ala. 692,) the court, in speaking of the proof of authority from a father to a son to buy goods, said : " The facts were proven to the jury, from which, according to the authorities above cited, the law presumed an authority from the father to the son to buy the goods, and there was no proof to rebut the presumption. This, we think, authorized the court to charge the jury, that, if they believed the *facts*, they were bound to infer the authority ; in other words, they were bound to find for the plaintiff." The distinction established by this and other cases cited seems to be this : where facts are proved, from which the law presumes a certain other fact which is in issue, the court may charge the jury, that they are bound to infer the existence of the fact in issue ; and, if that fact is decisive of the cause on trial, in favor of either party, the court may charge the jury, that they are bound to find a verdict in favor of such party, if they believe the evidence from which that fact is inferrible ; but, if from evidence the jury may or may not infer the existence of another fact, which is material to the finding of a verdict in favor of one or the other party, and they are not bound to make an inference one way or the other, then it is error for the court

to instruct them that it is their duty to infer the existence of such fact, or to charge them they must find a verdict in favor of either party.

In *McDonnell v. Br. Bank*, (20 Ala. 316,) it appears that the court below charged the jury, " that, if they believed the *proof*, the agency was established." This court said in that case : " However strongly the proof may have tended to establish such inference, still, it is an inference of fact from the other proof, which the jury might very properly draw, but which the court, as matter of law, could not assume."

It is said in several cases, that where there is no conflict in the testimony, the court may, on the request of either party, charge the jury, that, if they believe the evidence, they must find for that party.—*Bryan v. Ware*, 20 Ala. 687; *Stokes v. Jones*, 21 Ala. 731. But, this doctrine must be received, subject to qualifications established in other adjudications. In another case it is said, that if the evidence is clear, and without conflict, and it is only necessary to draw a legal conclusion from it, it is not error to charge the jury, that, if they believe the evidence, they must find for the party whose case is made out.—*Abney v. Pickett*, 21 Ala. 739. If there is a conflict in the evidence, such a charge would be erroneous.—*Knight v. Bell*, 22 Ala. 198; *Woolfork's Adm'r v. Sullivan*, 23 Ala. 548; *Allman v. Gann*, 29 Ala. 240.

In *Saltmarsh v. Bower & Co.*, (22 Ala. 221,) it was held, that whether certain facts amounted to notice to a party, of a transfer of an account, " was a fact to be tried by the jury, and it was for them, and not for the court, to determine whether the evidence established such fact. The charge asked would have been an invasion of the province of the jury." To the same effect is the case of *Pritchett v. Munroe*, 22 Ala. 501. In the latter case, it was held, that a charge is erroneous, which takes away from the jury, and refers to the court, the determination of the question, whether the facts of the case were such as to put the purchaser on his guard, and require him to resort to the ordinary and accessible means of information.

In *Hollingsworth v. Martin*, (23 Ala. 591,) and in some of the cases already cited, it is held, that when the plaintiff

alone offers testimony, a charge that, if the jury believed the evidence, the plaintiff could not recover, is equivalent to a demurrer, and raises the same question. But suppose that both parties introduce evidence, which, though not conflicting, tends to support the claim of the one and the defense of the other, and that the plaintiff or defendant should ask a general affirmative charge; how could the rules applicable to a demurrer to evidence, which is only allowable by one party to the sufficiency of the evidence of the other to support the claim, or to make out the defense, be legally enforced? It must be by making every intendment or inference from the evidence of the party asking such a charge, against him, that could be drawn from all the evidence, or by requiring him to admit every fact that the evidence tends to prove in favor of the adverse party, and against himself; or, at least, every fact which the evidence of the adverse party tends to prove in favor of the latter, and every fact which the evidence of the party asking the charge tends to prove against himself. I admit that I have found it difficult to apply the rules which pertain to a demurrer to evidence, to the case supposed; and I think it would have been better to have only allowed a general affirmative charge, in a case where a demurrer to evidence would have been allowed at common law. But this practice was established by the foregoing decisions, prior to the adoption of the Code of 1853, to the extent as shown in the foregoing adjudications of this court.

The Code, by section 2274, declares, that the court "shall not charge upon the effect of testimony, unless required to do so by one of the parties." This did not enlarge the powers of the court in this respect, but, as we understand, limited or restricted the right of the court to giving such charge when required by one of the parties. Before the Code, the court could give such a charge in certain specified cases, as settled by the decisions of this court, with or without request from either of the parties; and this provision of the Code did not authorize the court to give such a charge, when required by either party, in cases where this court had decided it would be error to give it; but limited the court to giving such as could be properly given,

Morris v. Hall.

when required to do so by one of the parties. *It hath this extent—no more.*

We will proceed with the review of the decisions made since the adoption of the Code.

In *Ewing v. Peck*, (26 Ala. 410,) this court, in speaking of a voluntary payment, which was a fact materially affecting the merits of the cause, said : " Now, we will not say that the payment, under these circumstances, may not have been voluntarily made ; but, whether it was or not, was a question for the jury, and one which the court could not properly determine,—a question of intent, as being the free act of the party, or as being superinduced by the process or levy."

In the case of *Freeman v. Scurlock*, (27 Ala. 407,) it appears that the court below charged the jury, " that the evidence was not sufficient to make out a conversion of the slaves, against either of the defendants ;" and this court said : " This charge can only be supported, in cases where, had the party in whose favor it was given demurred to the evidence, the judge might properly have sustained the demurrer. In such case, as the party demurring is required to admit, as a fact, what the evidence tends reasonably to establish, so that the duty of trying the facts shall not be devolved upon the court, but merely the duty of declaring the law arising upon them, it follows, that if there be any evidence which reasonably tends to show a conversion of the slaves by either of the defendants in the case before us, the charge can not be supported."—*Bryan v. The State*, 26 Ala. 65.

In *Stanley v. Nelson*, (28 Ala. 514,) this court held, that " it is an invasion of the province of the jury, for the court to instruct them, to the prejudice of a party, as to the effect of evidence susceptible of a construction different from that placed upon it by the court."—*Dill v. The State*, 25 Ala. 15.

In the case of *Lawler v. Norris*, (28 Ala. 675,) it was held, that, in order to support a general affirmative charge, in favor of the defendant, " the evidence must be clear, without conflict, and leave nothing to be done except to draw a legal conclusion from the facts." The same rule is

applicable to such a charge given in favor of the plaintiff. But such conflict should be as to some material question in issue.—*Upson v. Raiford*, 29 Ala. 188; *Drake v. Flewellen*, 32 Ala. 106; *Peebles v. Tomlinson*, 33 Ala. 336.

In *Crum v. Williams*, (29 Ala. 446,) the second head-note expresses the opinion of the court as follows: " The court may properly refuse to charge the jury, at the request of either party, that, if they believe the evidence, they must find for him, unless the facts proved, of themselves, independent of any inference which the jury might have drawn from them, entitled him to a verdict." It must be observed, in connection with this case, that this court has held, that when a general affirmative charge is properly asked, it is error for the court to refuse to give it.—*Rhodes v. Otis*, 33 Ala. 578.

In *Gunter v. Lecky*, (30 Ala. 591,) the court below charged the jury, " that, if they believed the aforesaid *state of facts* to be true, they must find a verdict for the defendant." The question, whether the plaintiff had or did not have a license from the probate judge, was material to the determination of the cause, and there was no direct or positive proof one way or the other; and this court said: " Now, although the jury might have been authorized, from the admission made, and from the failure of the plaintiff to produce any license, to infer and find that he had no license; yet it was not *a conclusion of law*, from the facts stated, that he had no license. The court erred, therefore, in not leaving to the jury the question of the existence or non-existence of the license. * * It will not do for the court to overlook the distinction between facts admitted, and the inferences which the jury only are authorized to draw therefrom."—See, also, *Rhodes v. Otis*, 33 Ala. 578.

In *Traun v. Keiffer and Wife*, (31 Ala. 136,) the question of a delivery was involved, and the proof was circumstantial; and the court said: " However weak the proof may have been, the court properly refused to charge the jury, that it was insufficient to establish a delivery. If there was any proof, it was the province of the jury to determine its sufficiency." The charge passed on was one which involved the effect of the testimony.

In *White v. Hass*, (32 Ala. 430,) the court below charged the jury, "that, if they believed the evidence, they must find for the plaintiff, for the amount of said note with interest." No evidence was introduced by the defendant. A question arose, whether an alteration of the note was brought to the knowledge of the defendant. This court said : "We will not say, that the facts proved by the evidence in the present case were not sufficient to justify *the inference by the jury*, that the alteration was brought to the knowledge of the defendant ; and that when brought to his knowledge, he assented to it. But the court is not authorized, in such a case, to draw an inference of fact; and without such inference, the facts proved did not warrant the court to declare, as a conclusion of law, that the defendant had assented to the alteration. As this assent is not stated by any witness, nor admitted, the court should have left it to the jury to determine, whether or not he had assented to the alteration ; and should have charged them that, if they believed it, they should find for the plaintiff, the amount of the note and interest."

In *Buffington v. Cook*, (35 Ala. 312,) it appears that both parties introduced evidence ; the plaintiff documentary evidence, and oral testimony, and the defendant oral testimony only. The testimony of defendant tended to prove the defense set up. The court charged the jury, "that, if they believed the evidence, they must find for the plaintiff;" and this court held, that "the oral testimony did not authorize the charge which the court gave on the effect of the evidence. It certainly can not be affirmed that it establishes, without conflict, the right of the plaintiff to recover."

In *Ward v. The State*, (37 Ala. 158,) the court below charged the jury, that, if they believed the evidence, they must find the defendant guilty. There was only one witness examined on the trial, who made out a strong case against the defendant ; and this court said : "We concede, that these circumstances may have been strong, and from them the jury *may* have inferred that the parties had seated themselves to play at cards, and had so far entered upon the game as to deal out hands, and turn up a trump ; yet, in order to establish the defendant's guilt, it was necessary

that the jury should infer a further fact or facts than were positively sworn to by the witness. Such further fact, or facts, the law, unassisted by a jury, could not infer." And it was held that the charge invaded the province of the jury. 28 Ala. 700; 33 Ala. 413. There seems to have been no distinction taken or established between a criminal prosecution and civil action, in this respect.

In the case of *The Memphis & Charleston Railroad Co. v. Bibb*, (37 Ala. 699,) it appears that a question of negligence was involved, and the court said : " The testimony in this case tends to show, that the engineer failed to comply with the provisions of the first section of the act of 1858 ; and to this extent, there does not seem to have been any conflict in the testimony. But there was no witness who testified, or probably could testify, that the accident complained of was occasioned by the engineer's omission of duty. Before it could be affirmed that Mr. Bibb had lost his horses *on account* of the engineer's failure to comply with the duties enjoined on him by the statute, it was necessary that some other fact should be inferred from those of which proof was made. It is the province of the jury to draw inferences of fact; but the court can draw no such conclusions, except the case be within the operation of some legal presumption. The charge given on the effect of the evidence, if believed, invaded the province of the jury."

I think these, and other decisions of this court, may be considered as establishing the following propositions :

1. That a general charge on the *effect* of evidence can not be given, where there is any conflict in the evidence, as to any material point involved in the determination of the cause.

2. That such a charge is erroneous, where any fact, necessary to the decision of the cause, has to be inferred from the evidence, and which is not a legal presumption from it.

3. That when the plaintiff alone introduces testimony, such a charge in favor of the defendant is equivalent to a demurrer to the evidence ; or such a charge in favor of the plaintiff, on the evidence of the defendant, has the same effect as a demurrer thereto would have.

4. That where both parties introduce evidence, such a

Morris v. Hall.

charge may be given, if there is no conflict in the evidence on any material point, and there is no fact to be inferred by the jury from the evidence, material to the decision of the cause one way or the other.

5. That where both parties introduce evidence, and there is no conflict therein as to a material point, and the facts to be inferred are legal presumptions, the court may give a general affirmative charge; but, in all cases, it must be predicated upon a belief of the evidence by the jury.

6. That where both parties introduce testimony, and it only *tends* to prove the claim of the plaintiff, or the defense of the defendant, it is erroneous to give a general affirmative charge on the effect of the evidence.

. 7. That the courts should be careful not to invade the province of the jury.

The application of these rules, occasionally, becomes in practice a matter requiring nice discrimination; and in cases of difficulty and doubt, the proper course would be to leave it to the jury to decide, under appropriate instructions from the court, so as to secure to the parties the right of trial by jury; and should the jury make any clear mistake in their verdict, it could be set aside, upon an application for a new trial.

We proceed to the disposition of the questions made in the argument of counsel, keeping in view the principles established in the decisions above cited, so far as applicable.

[2.] We do not think that the contract of sale and purchase, made by appellee and the Bank of Louisiana, is within the prohibition of section 939 of the Code. The purchase of cotton by the bank, with Confederate treasury-notes, is not the exercise of the privilege of banking in this State, within the meaning of that section; and the case of *Wray v. Tuskegee Insurance Company*, (34 Ala. 58,) and the reasoning employed therein, is, in our opinion, decisive of that point. But, in our opinion, such contract was in violation of the laws of the United States, and the proclamations issued by the president in conformity thereto.—See the authorities cited on the brief of counsel for appellee.

[3.] In the case of *The Bank of Augusta v. Earle*, (13 Pe-

ters, 587,) Taney, C. J., in delivering the opinion of the court, said : " It may be safely assumed, that a corporation can make no contracts, and do no acts, either within or without the State which creates it, except such as are authorized by its charter ; and those acts must also be done by such officers or agents, and in such manner, as the charter authorizes. And if the law creating the corporation does not, by the true construction of the words used in the charter, give it the right to exercise its powers beyond the limits of the State, all contracts made by it in other States would be void." To the same effect see *City Council of Montgomery v. M. & W. P. R. R. Co.*, 31 Ala. 76 ; and *Grand Lodge of Alabama v. Waddell*, 36 Ala. 313. It does not appear from the record that the charter of the bank, if there is one, was introduced in evidence, or its contents proved. It would seem to follow, therefore, that the appellant failed to show that the Bank of Louisiana, if it is a corporation, acquired any title to the cotton by virtue of the contract, even if it were otherwise valid.

[4.] But, though a purchaser obtains possession of property under a contract which in law he is incapable of entering into, or of taking a title to property under it ; yet the seller may place himself in such a condition, that he can not sue for and recover the property. If the title passes under a contract, the purchaser is under no necessity to resort to the doctrine of estoppel for his protection, nor is any one claiming under him. The appellant contends, that, although the contract of sale was void, yet, having been fully executed, and the *possession* of the property having passed to the bank or its agents, and the appellee having received the purchase-money, he can not, in a suit to recover the value of the property, set up the invalidity of the contract of sale, to show that his title to the cotton has never been divested ; and further, that the appellee is *estopped* from asserting any title to the cotton, as against the appellant, under the evidence set out in the record.

And first, as to the question of delivery : Can a party, who has sold to another *personal* property, and delivered the possession, under a contract in violation of law, or where the purchaser was incapable of making such a con-

tract so as to bind either party, sue for and recover its value in an action of trover. I am clear that, if such contract of sale is illegal, and in violation of law, and both parties stand *in pari delicto*, the seller who has delivered possession under such a contract, and received *the purchase-money*, can not maintain such an action. Neither can either party, in such a case, maintain an action on the contract. *Black v. Oliver*, 1 Ala. 449 ; *Rochelle v. Harrison*, 8 Porter, 351 ; *Windham, use, &c., v. Childress et al.*, 7 Ala. 357 ; *Boyd v. Barclay*, 1 Ala. 34; *Smith v. Johnson*, 37 Ala. 636 ; *Givens v. Rogers*, 11 Ala. 543. In the case of *Dodson v. Harris*, (10 Ala. 566,) the purchase-money was not paid.—*Walker v. Gregory*, 36 Ala. 180 ; *Webb v. Kelly*, 37 Ala. 333. The maxim, "*Cum par delictum est duorum, semper oneratur petitor, et melior habetur possessoris causa*," has a field for operation in such cases as this. *Potior est conditio possidentis.*

And also it seems to me, that such an action can not be maintained against a person, natural or artificial, who has no authority to make, or was incapable of making, such a contract. After a party has received the value of chattels sold and delivered to such a purchaser, he can not be heard in a court of justice to assert the incapacity of the purchaser to make the purchase, as a ground of recovery, and thereby obtain a double satisfaction. Nor can he be allowed to do so against one who holds under such a purchaser. The money so received must be considered as closing his mouth against making such an assertion,—he being competent to contract, and there being no fraud or imposition on the part of the purchaser. A delivery, and the payment of the purchase-money, pass the title.—*Jemison v. Woodruff*, 34 Ala. 143. And this, whether the *contract of sale* was void or voidable. Such, at least, is the result, as to the parties to the contract, in courts of common law.

The effect of the charge, in the case in hand, was to take from the jury the question, whether there was or was not a delivery of the cotton to the Bank of Louisiana, or its agents. If there was a delivery of the cotton, so as to pass the possession under the contract to the bank, then it would be error to charge them to find for the plaintiff, under the evidence set out.—*Thomas v. Degraffenreid*, 17 Ala.

35

602; *Nelson v. Iverson,* 19 Ala. 95. And so, too, as to the question of *estoppel* by matter *en pais.* Whether there was such an estoppel, is a question for the jury to decide from the evidence in this cause, under instructions as to the law upon that subject by the court.—1 Greenl. Ev. § 209.

We intend to be understood as intimating no opinion upon the sufficiency of the evidence to prove a delivery, or an estoppel by matter *en pais.* It is enough to say that there is evidence proving, or tending to prove some, if not all, of the constituents of such a delivery and estoppel.— 1 Greenl. Ev. §§ 207–209; Long on Sales, 259–275 (148 to 159); *Magee v. Billingsley,* 3 Ala. 679, and cases therein cited.

[5.] In the case of *Kirk v. Morris,* decided at the June term, 1866, we held, that a *stranger,* who replevied property attached, must be held to have done so for the defendant in the suit; and it would seem to follow that, when sued in trover for a conversion of the property, he can make all defenses which the defendant could have made, if he had been sued. Such person holds under the defendant to the suit. Any act which would operate as an *estoppel* against the appellee, in favor of the bank, would therefore seem to be available as a defense for the appellant. Whether any right or lien which the creditor in attachment might set up against the title of a claimant, who had a title superior to the defendant in attachment, but one which is subordinate to the right or lien of such creditor, could be available as a defense to the person replevying, when sued by such claimant, we will not now decide.

[6.] The question whether there was a conversion by appellant of the cotton, *under all the evidence* in this case, which would authorize a verdict against the appellant, was one also for the determination of the jury, under instructions from the court as to the law applicable to the subject.— *Knight's Adm'r v. Vardeman,* 25 Ala. 262.

We do not think that a person who is authorized under the statute to replevy property levied on, and who does so in good faith, under an order of the court having jurisdiction of the subject-matter, without any notice of the claim of the real owner, and who makes no use or disposition of

the property inconsistent with his duty as a bailee thereof under such order, and who holds in subordination thereto, and not otherwise, is, *in legal presumption*, liable in an action of trover to the real owner. It appears that Morris shipped the cotton from the place where it was when he replevied it. But it does not appear whether he did so to convert it to his own use, or for safe-keeping and to secure it for the defendant in attachment, or to have it in condition to be surrendered to the sheriff in case a judgment was rendered for the plaintiff in the attachment suit. If the defendant in the attachment had replevied the property, and had done any act *before* such replevy which amounted to a conversion of the property, it is unnecessary to decide whether he would or would not be liable in an action of trover to the owner, although at the time it was brought he held the property under a replevy bond made in conformity to law. But, if a person, after obtaining possession of property under the law, without any notice or knowledge of the claim or title of the owner, does any act which amounts to a conversion of it, we do not see why, upon principle, the owner could not maintain trover against him. It was for the jury to say, upon all the evidence, whether Morris was guilty of a conversion; and in this respect the court likewise invaded the province of the jury in the charge given. The conversion, which is the *gist* of the action, must be prior to the commencement of the suit.—*Storm v. Livingston*, 6 John. 44.

In support of the views herein expressed upon the point as to what is a conversion, and the proof necessary to establish it, we refer to the case of *Dent et al. v. Chiles' Adm'r*, 5 Stew. & Por. 383, and the authorities therein cited; and we fully recognize the correctness of the principles therein laid down.—See, also, *Murray v. Burling*, 10 John. 172; *Lockwood v. Bull*, 1 Cow. 322; *Robinson v. Burleigh*, 5 N. H. 225; *Houseman v. Stewart*, 28 Ala. 685; *Hartshorn v. Williams*, 31 Ala. 152; Story on Bail. §§ 110, 113, 132; *Weinburg v. Conover*, 4 Wis. 803; *Rogers v. Hine*, 2 Cal. 571; *Munger v. Hess*, 28 Barb. 75; *Davidson v. Donudi*, 2 Smith, (N. Y.) 121.

When there is evidence tending to show a reasonable excuse for the refusal of the defendant to deliver the property, and which is relied on as constituting a conversion, the sufficiency of the excuse is a question for the jury, under proper instructions by the court.—*Connor v. Allen*, 33 Ala. 515 ; *Watt v. Potter*, 2 Mason's Rep. 77.

In this case, the jury were authorized to look to all the facts in evidence, to determine whether appellant had a reasonable excuse for refusing to deliver when the demand was made. If, under the evidence and the instructions of the court, they should find that there was a delivery of the cotton to the Bank of Louisiana, and that appellee was estopped from claiming the cotton, then there could be no conversion which would give him a right of action. If, on the other hand, the jury should determine that there was no such delivery or estoppel as would affect the rights of appellee, still, it would be their duty to consider all the evidence, and determine whether there had been a conversion of the property by appellant ; and whether the appellee had not by his own acts placed the appellant in a condition in which a demand of, and refusal to deliver the cotton, would, of themselves, in connection with all the evidence, amount to a conversion, taking into consideration the reason assigned by appellant for declining to deliver the cotton. The charge given, *in effect*, took these questions from the jury.

There may be other objections to the charge given by the court, than those herein above noticed, but none others have been insisted on in argument ; and, as what we have said may be sufficient for the direction of the court below on another trial, we will not say anything more on the correctness of the charge given to the jury, further than, on the questions of delivery, estoppel and conversion, this opinion must be understood as only deciding that the charge was incorrect in assuming the evidence failed to establish the first two and proved the last.

As to the other questions argued by counsel, it is also unnecessary to say anything, as they may not arise on another trial in the same form as presented on this record.

For the error pointed out, the judgment of the city court against appellant must be reversed, and the cause remanded.